(No. 26261.—)
BROTHERHOOD OF RAILROAD TRAINMEN *et al.* Appellants,
*vs.* TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS,
Appellee.

*Opinion filed March 16, 1942—Rehearing denied May 12, 1942.*

404

GEORGE F. BARRETT, Attorney General, A. A. SCHWARZ-BACH, and ALVIN E. STEIN, (ALBERT E. HALLETT, JR., of counsel,) for appellants.

KRAMER, CAMPBELL, COSTELLO & WIECHERT, (CARLETON S. HADLEY, WALTER N. DAVIS, and LOUIS A. Mc-KEOWN, of counsel,) for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

Appellants seek reversal of a judgment of the circuit court of St. Clair county setting aside an order of the Illinois Commerce Commission requiring appellee to furnish, throughout the year, and maintain, caboose cars or shelter cars to be attached to cuts of freight cars transported to and from its yards in Illinois. The cause arises by petition of appellant Brotherhood of Railroad Trainmen, an organization representing trainmen and switchmen employed by appellee, filed with the Illinois Commerce Commission requesting that an order be entered requiring appellee to furnish caboose or shelter cars for its switchmen while in the performance of their duties in the territory in and around East St. Louis, Illinois. The petition alleged that appellee has failed to provide such cars for switchmen in the above-mentioned territory, and as a result thereof switchmen, in the performance of their duties on transfer trains are neces-

sarily required either to ride on the draw-bar, in between freight cars, or on the top, or on the side of freight cars where numerous reduced vertical and horizontal clearances prevail, thus endangering the life, health and safety of such switchmen and of other employees, and of the public within the State of Illinois. Appellee's answer denied the power, right or jurisdiction of the Illinois Commerce Commission to enter any order in regard to the subject matter of the complaint so far as any movements in interstate commerce are concerned, and alleged that it now provides all the facilities reasonably necessary for the health, safety and lives of said employees.

Appellee is a railroad corporation which performs terminal services in the railroad switching district of East St. Louis, Illinois, and St. Louis, Missouri. Switchmen in its employ are assigned to particular switching crews. These crews make and break up trains in the yards, make deliveries from connecting roads to appellee; make transfer runs from the various yards of appellee to and from industries; make up trains and couple cars together, see that the air-brakes are coupled and in order on the train, and when the train leaves the yard for a destination the switchmen take their proper positions on the train, the rear man taking his position on the rear car of the train, where he is required to ride. His duties are to line all switches back into proper position after their use by the train, and in case of a reverse movement, to watch street and highway crossings to protect the public. On some of the transfer runs, side or overhead clearance is insufficient to permit riding on the side or top of the rear car, in which case the rear switchman is required to ride the rear coupler of the car. The length of the trains handled by a crew on a trip varies from one to a hundred cars. A caboose is a railroad car furnished for the housing of train crews and equipped for their safety; provides a place for the crew to carry necessary flagging equipment, raincoats, extra or excess clothing, necessary first-aid equipment and lunches; also to do

any necessary clerical work. During the winter months, the handholds, draw-bars and sill steps of cars are often covered with ice, making it difficult for switchmen to get to the top of a car or to prevent being jerked or jarred off. No caboose or shelter cars are furnished to crews working out of certain of the involved yards, though they are furnished from October to May each year on other runs by appellee, and on still other runs are furnished the year round. Various of the runs are entirely within the confines of the State of Illinois, others originate in Illinois and terminate in the yards of appellee in Missouri by crossing the Eads or Merchant's bridge, or originate in Missouri and after passing over one of those bridges terminate in one of the yards of appellee in Illinois. Ninety-eight per cent of the merchandise transferred in the runs between appellee's yards is being transported in interstate commerce. About sixty-eight passenger trains cross the Eads bridge each day. During the early part of each week about the same number of freight trains cross the bridge and later in the week the freight trains exceed the passenger trains in number. Approximately the same number of trains cross the Merchant's bridge each day.

The Eads and Merchant's bridges span the Mississippi river between East St. Louis in Illinois and St. Louis in Missouri. Each bridge has thereon double-track railroads connecting with appellee's yards. The Commerce Commission found that the boundary line between the State of Illinois and the State of Missouri intersects the Eads bridge at a point about 1000 feet west of the west curb of Front street in the city of East St. Louis, and the Merchant's bridge at a point about 775 feet west of the Illinois shore line when the river is at a stage of 2.4 feet.

The commission's order, so far as the principal questions here are concerned, consisted of two items or findings and orders. By finding No. 34 it found that it is reasonable to require appellee to furnish, maintain and operate caboose

cars throughout the year on its various transfer, delivery and industrial runs in and out of its three yards: (1) Central District Yard, (2) Madison Yard, and (3) Wiggins No. 2 Yard, the order specifying the particular runs among those yards or to line roads, all of which are within Illinois; and its finding No. 35 was the same as finding No. 34 as to reasonableness of the requirement, and ordered that in so far as operated within the State of Illinois: (1) in all runs into or out of C. D. Yard *via* Eads bridge, (2) runs *via* Merchant's Bridge moving in or out of (a) Madison Yard, and (b) Wiggins No. 2 Yard, appellee furnish, maintain and operate caboose cars on its transfer, delivery and industrial runs.

On appeal the circuit court found that the portion of the order of the commission requiring cabooses to be attached to runs moving between appellee's yards in Illinois and over the Eads and the Merchant's bridges, is an interference with interstate commerce and beyond the power of the Illinois Commerce Commission. The court therefore set aside and reversed the order of the commission. It did not consider the validity of finding No. 34 and that part of the order since its power of review was merely to confirm or set aside the order as a whole. This was the correct procedure. *Brotherhood of Railroad Trainmen* v. *Elgin, Joliet and Eastern Railway Co.* 374 Ill. 60.

The principal question in the case concerns the validity of the order of the commission requiring cabooses for these runs over the bridge. Though the commission's order applies only to cuts of cars moving within the State, it is argued by appellee, and not disputed, that the only practical way in which the order can be carried out on runs across the river is to carry these cabooses across the bridge into appellee's yard on the opposite side of the river.

Appellants argue that notwithstanding the trains involved in order 35 are moving in interstate commerce, the attaching of cabooses thereto is not a direct burden on inter-

state commerce but affects it but indirectly or incidentally, and that the order lies within the inherent power of the State to enact reasonable regulations for the protection of the health, lives and safety of persons within its confines. It is urged that only when Congress has acted is the power of the States impaired, and then only to the extent that their regulations shall not be such as to be in conflict with or repugnant to the action so taken by Congress. Appellee insists that the order based upon finding No. 35 as to the bridge runs is an undue burden upon, and a regulation of, interstate commerce, in violation of the commerce clause of the Federal constitution, and takes appellee's property without due process of law.

It is settled by decisions of the Supreme Court of the United States that a State can do nothing which will directly burden or impede interstate traffic or impair the usefulness of facilities for such traffic. (*Atlantic Coast Line Railroad Co.* v. *Wharton,* 207 U. S. 328, 52 L. ed. 230; *Austin* v. *Tennessee,* 179 id. 343, 45 L. ed. 224; *Illinois Central Railroad Co.* v. *Illinois,* 163 id. 142, 41 L. ed. 107.) It is equally well settled that State or local enactments, passed in the exercise of the police power of the State, in the interest of the public health and safety, notwithstanding the regulation may incidentally or indirectly affect interstate commerce, are valid. *Minnesota rate cases,* [*Simpson* v. *Shepard,*] 230 U. S. 352, 57 L. ed. 1511, and the cases therein cited.

The question involved in this case is one of power of the Commerce Commission. The question whether a statute of the State or an order of the commission acting within the authority conferred upon it by the General Assembly of the State, imposes a direct burden upon interstate commerce, is one of which the Supreme Court of the United States is the final arbiter. There are, however, certain principles under which rights of the States in the premises are to be recognized. All powers inhering in the people of the

States, which have not been expressly granted to the United States or prohibited to the States, remain with the people. The State, by reason of its inherent and reserved police power, may enact laws promoting the peace and good order of society, for the preservation of life and health, or conducive to the comfort, convenience and welfare of the people. Notwithstanding acts coming within this reserve police power operate on the movements of interstate commerce and persons engaged therein, such law is nevertheless valid unless its effect is to directly lay some burden or restriction on interstate commerce which would not otherwise exist. (*Hennington* v. *State of Georgia,* 163 U. S. 299, 41 L. ed. 166; *Minneapolis and St. Louis Railroad Co.* v. *Emmons,* 149 id. 364, 37 L. ed. 769; *People ex rel. Stead* v. *Chicago, Indianapolis, and Louisville Railway Co.* 223 Ill. 581.) Though by the Federal constitution Congress is given exclusive power to regulate commerce, the States may, in the exercise of the police power, make reasonable rules in regard to the method of carrying on interstate business within the State, such as to provide precautions that shall be used to avoid danger to those engaged in interstate commerce within the State, or to the public, or may designate facilities for the comfort of passengers and employees, safety of freight carried, and the like. The test of the validity of such enactments or orders is whether they are consistent with the general requirement that interstate commerce shall be free and unobstructed. If they are, they do not amount to a regulation of such commerce. *Houston and Texas Central Railroad Co.* v. *Mayes,* 201 U. S. 321, 50 L. ed. 772.

The fact that a railroad may be engaged in both interstate and intrastate commerce, does not prevent a State from adopting such regulations as it may deem proper to provide for the safety of the men engaged in carrying on intrastate commerce, if such regulations are not inconsistent with or repugnant to acts of Congress adopted for the regu-

lation of railroads engaged in interstate commerce. (*Luken v. Lake Shore and Michigan Southern Railway Co.* 248 Ill. 377; *People v. Chicago, Indianapolis and Louisville Railway Co. supra; Missouri Pacific Railway Co.* v. *Kansas,* 216 U. S. 262, 54 L. ed. 472.) It not only lies within the power of the State, but it is its duty, to establish such regulations as are reasonable and necessary for the safety of those engaged in the business conducted within the State. The rule is settled that so long as Congress does not occupy the field of regulation to be considered in a given case, each State is empowered to make regulations within that field regarding the safety of persons engaged in interstate commerce that passes through the State. Such regulations do not purport to regulate interstate commerce, but to care for the safety of persons within its borders. *Chicago, Rock Island and Pacific Railway Co.* v. *Arkansas,* 219 U. S. 453, 55 L. ed. 290.

In the case before us the order of the Commerce Commission appealed from, affected two classes of freight movements. The first was dealt with in what is known as finding No. 34 of the order, and had to do with interyard movements of freight, wholly within the State, but which movements contained largely shipments destined for interstate commerce; and finding No. 35 of the order, having to do with switching movements of cars across the Mississippi river into appellee's yards in Missouri. The order required the use of cabooses or shelter cars in so far as those movements take place within the State.

We do not doubt the power of the Commerce Commission, delegated to it by the General Assembly under the police power, to make reasonable regulations protecting the health, safety and welfare of those engaged in appellee's switching business, so long as such regulations do not constitute an attempt to regulate, or do not directly burden interstate commerce, or run counter to Federal regulations on the subject. Appellee says these orders are attempts to

regulate interstate commerce and constitute a direct burden upon such commerce and so are void for want of jurisdiction in the commission to promulgate them. It is not claimed that the Congress has specifically legislated on the subject of its use of these cabooses though it is argued that Congress has preempted the field.

The evidence shows that without cabooses or shelter cars, switchmen are required to ride on the outside of the rear car of the cut of cars being moved, and that in many places in the yards and on the bridges, side or overhead clearances are insufficient to permit riding on the side or top of the cars, with the result that the switchman is required to ride upon the coupler, which is dangerous and becomes specially so during storm or winter periods. It is shown that the jarring or sudden stopping or starting of a cut of cars may cause the switchman to lose his hold and be thrown and to suffer injury. Protection against casualties of that sort is not only within the power but the duty of the State when the same is exercised in a manner not inconsistent with the Federal laws governing interstate commerce, where such have been enacted or where such regulations do not result in a direct burden on interstate commerce.

As we have seen, the circuit court did not pass upon the validity of finding No. 34 of the commission's order. However, both parties have briefed the question concerning the power of the commission to enter its order on that finding, and the reasonableness of that order, and as that question is involved in the validity of finding No. 35, pertaining to transfers across the bridges, it becomes necessary to examine fundamental questions involved in both findings.

Whether either of these findings and orders of the commission is valid, depends in the main upon whether compliance with such orders lays a direct burden on interstate commerce. Where the effect of an intrastate transaction or regulation, as applied to interstate commerce, is merely indirect, the regulation producing such transaction remains

within the domain of the State power. (*Schechter* v. *United States,* 295 U. S. 495, 79 L. ed. 1570.) As was said by the Supreme Court of the United States in *Carter* v. *Carter Coal Company,* 298 U. S. 238, 80 L. ed. 1160, quoting from the *Schechter case,* "If the commerce clause were construed to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the Federal authority would embrace practically all the activities of the people and the authority of the State over its domestic concerns would exist only by sufferance of the Federal government. * * * The distinction between direct and indirect effects of intrastate transactions upon interstate commerce must be recognized as a fundamental one, essential to the maintenance of our constitutional system." It was in the *Carter case* pointed out that the word "direct" "implies that the activity or condition invoked or blamed shall operate proximately—not mediately, remotely or collaterally—to produce the effect. It connotes the absence of an efficient intervening agency or condition. And the extent of the effect bears no logical relation to its character."

Counsel argue as to both findings No. 34 and No. 35 of the Commission's order that they are a burden on interstate commerce in that they require an additional amount of time to attach and detach these cabooses and are unreasonable in that they involve a very large additional expense to appellee, and so constitute an unwarrantable interference with interstate commerce. The evidence before the commission as to the amount of time consumed was in conflict, ranging from eleven minutes to forty minutes per movement, though appellant concedes that some time is required to add a caboose to these cuts of cars. It is argued that time required to comply with this order may, at times, involve appellee in penalties for failure to comply with certain regulations governing the transportation of perishable goods and livestock. It does not appear, how-

ever, that such is a necessary result nor that such results cannot be avoided by arrangement of train schedules. We are of the opinion that the record in this case does not establish that time consumed in complying with this order is so great as to amount to a regulation of interstate commerce or a direct burden upon it. The order does not purport to do so but was obviously promulgated to protect the lives and health of citizens of this State engaged in appellee's business within the State.

As to finding No. 35, which involves cuts of cars taken across the river into Missouri, counsel for appellee earnestly argue that since there are no means of leaving a caboose at the State line, where it could be picked up on return, the only practical way in which compliance with the order of the commission may be had is to carry such caboose with the cut of cars into its yards in Missouri and attach it in Missouri, and bring it back over the bridges so as to comply with the order within the State. This, appellee contends, is, in practical effect, a regulation of the movements of the appellee's trains in the State of Missouri, which is beyond the power of this State or its commission.

Numerous cases of the Supreme Court of the United States have been cited, none of which is entirely analogous on the facts to the case before us. In *Missouri Pacific Railway Co.* v. *Kansas, supra,* the Kansas Supreme Court ordered peremptory *mandamus* to compel the railroad to obey an order of the State Board of Railroad Commissioners requiring passenger train service to be established and maintained between Madison, Kansas and the Missouri State line on what is known as the Madison branch of the Missouri Pacific Railway. It was objected there that there were no terminal facilities at the State line between Kansas and Missouri and that to comply with the order the railroad would be required either to construct such facilities at that point or to carry its trains on through to and beyond Monteith Junction in the State of Missouri, where the Madi-

son branch of the road intersects with the Missouri Pacific. The court pointed out, however, that the order of the Railroad Commission was to supply the passenger service to the State line, and the fact that the practical method of compliance was to run the train across into Missouri, neither rendered the order unreasonable nor a direct burden on interstate commerce. It was also pointed out that its charter provisions required that the railroad conduct passenger traffic along this branch so far as it lay within the State of Kansas.

We are unable to see that charter contract features distinguish that case from the one before us on the question of State power. A claim of duty resting upon a utility to render service, whether it arise out of its charter contract, an act of the General Assembly, or an order of an agency created by the General Assembly, based upon the police power of the State, involves the same ultimate question whether the State's order, sought to be invoked, is an attempt to regulate interstate commerce or places a direct burden upon that commerce. In this case and in the *Missouri Pacific case* the same tests are to be applied in determining that question. In that case it was pointed out that the fact that the railroad extended its train operations into another State did not destroy the power of Kansas over its domestic commerce or bring local matters under the sway of Federal concern. That case, it will be noted, did not involve the character of order here under consideration, which draws its validity, if it has such, from the power of the State to protect its citizens from danger of injury.

*Atchison, Topeka and Santa Fe Railway Co.* v. *LaPrade,* 2 Fed. Supp. 855, involved the train limit law of Arizona, which provided that no trains of more than 70 cars should be transported in the State. The act was by a three-judge court held to be an invasion of the interstate commerce clause of the Federal constitution. It was there pointed out

that as trains from eighty to one hundred cars were required to be broken into trains of not more than seventy cars at the boundary of Arizona, and additional engines and crews provided during the trip across the State, to be again coupled into long trains after leaving the State, the Arizona act infringed upon a field which was exclusively under Federal control, and the absence of Federal regulation concerning them did not give power to the State to make rules which so necessarily controlled the conduct of interstate commerce; that the subject of the length of trains engaged in interstate traffic is national in character, requiring uniformity of regulation, which regulation is placed entirely under the control of Congress. Counsel for appellee argue that the case before us is analogous to the *LaPrade case.* This distinction, however, is to be noted: in the Arizona case the State requirements necessarily conflicted with Federal control of interstate commerce. Length of trains is a matter of national railroading, and the Arizona law was a direct attempt to control interstate commerce. There was no claim that it attempted to do anything else. It was not passed, as in the case before us, in the exercise of the State's police power and duty to protect the lives and safety of those engaged in operating the interstate trains.

It was pointed out in *Missouri Pacific Railroad Co.* v. *Norwood,* 283 U. S. 249, 75 L. ed. 1010, that in the absence of a clearly expressed purpose so to do, Congress will not be held to have intended to prevent the exercise of the police power of the States. In *South Covington and Cincinnati Street Railway Co.* v. *Covington,* 235 U. S. 537, 59 L. ed. 350, it is pointed out that in numerous instances that court had sustained local enactments based on the exercise of police power in the interest of public health and safety, notwithstanding such regulations might incidentally or indirectly affect interstate commerce. This is

also·pointed out in the *Minnesota rate cases,* where the subject is reviewed at length. *Simpson* v. *Shepard,* 230 U. S. 352, 57 L. ed. 1511.

Counsel for appellee cite the *Covington case* as analogous on the facts to the case before us. In that case a petition was filed by the railway company in the Kentucky State court to enjoin the city of Covington from enforcing an ordinance for the regulation and operation of the streetcars of the company. This ordinance contained numerous provisions. Among others, it required that no street-car be allowed to carry more than one-third greater number of passengers, over and above the number for which seats were provided; that the company run and operate cars in sufficient number to at all times reasonably accommodate the public, and that it maintain a temperature in its cars of at least 50 degrees Fahrenheit. Many of the cars of the company operated across the Ohio river over a bridge and into the city of Cincinnati, Ohio. Its traffic as to them was therefore interstate in character. The first two of the three provisions of the ordinance just referred to were held to be invalid on the ground that the necessary effect of such regulations was not only to determine the manner of carrying passengers in Covington and the number of cars to be used in so doing, but necessarily directed the number of cars to be run in Cincinnati and the manner of loading them there, where traffic was much more impeded and where the franchise privileges of the railway would not accommodate such increased number of cars. It was observed that if Covington could regulate these matters, Cincinnati could likewise, and interstate business might be impeded by the varying regulations. The provision of the ordinance regulating temperature to be maintained was held unreasonable and as practically impossible of performance. Other provisions of the ordinance were that the street-car company permit no one to ride on the rear platform unless the same is provided with suitable rail or barrier, and that no passen-

gers be permitted to ride on the front platform unless a rail or barrier be provided separating them from the motor-man, and that the company at all times keep its cars thoroughly clean and ventilated. These provisions were sustained as coming within the inherent police power of the State of Kentucky and it was held that it was competent for the State to provide for the safety and welfare of the people notwithstanding such regulations might indirectly affect interstate commerce.

Appellee's counsel argue that the *Covington case* is direct authority for their claim that this order of the Commerce Commission is invalid. They point out that if cabooses are required on these interstate switching runs, appellee will necessarily have to transport them for some distance in Missouri, and Missouri could enact conflicting regulations. It will be noted that the factual situation in the *Covington case* was different, and was of much more difficulty. The franchise privileges of the street railway company in Cincinnati would not permit of compliance with the Covington ordinance and traffic conditions were much different. In the case before us appellee owns the switch yards on both sides of the river, into which the switching movements are taken. The additional burden in operation would thus principally be to provide places for and to attach these cabooses.

Does the fact, if such be a fact, that the only practical method of complying with the order would be to haul these cabooses into Missouri, of itself render the order of the commission invalid as a direct burden upon interstate commerce? In *New York, New Haven and Hartford Railroad Co. v. New York,* 165 U. S. 628, 41 L. ed. 853, the court was considering a New York statute regulating the heating of steam passenger cars, and directing that guards and guard posts be placed on railroad bridges and trestles of approaches thereto. It was contended that the statute was repugnant to the constitutional provision that Congress shall have power to regulate commerce among the several States,

and also repugnant to the fourteenth amendment of the constitution requiring that no State shall deprive anyone of property without due process of law nor deny to any person within its jurisdiction the equal protection of the laws. It was held that while laws of the State must yield to acts of Congress passed in execution of the powers conferred by the constitution, the mere grant to Congress of power to regulate commerce among the several States did not of itself and without legislation by Congress, impair the authority of States to establish such reasonable regulations as were appropriate for the protection of the health, lives and safety of its people. It was argued there, as here, that a conflict between State regulations in respect of heating passenger cars used in interstate commerce, would make safe and rapid transportation impossible, since the different States through which the trains were to travel might put into effect conflicting laws that would be a hardship upon travel. As to that objection the court replied: "These possible inconveniences cannot affect the question of power in each State to make such reasonable regulation for the safety of passengers on interstate trains as in its judgment, all things considered, is appropriate and effective. Inconveniences of this character cannot be avoided so long as each State has plenary authority within its territorial limits to provide for the safety of the public, according to its own views of necessity and public policy, and so long as Congress deems it wise not to establish regulations on the subject that would displace any inconsistent regulations of the States covering the same ground." It was in that case, as here, also contended that the statute was void in that it deprived the railroad company of its property without due process of law. This contention, however, was not sustained.

In *Atlantic Coast Line Railroad Co.* v. *Georgia,* 234 U. S. 280, 58 L. ed. 1312, a statute of the State of Georgia required railroads to equip their locomotives, hauling inter-

state trains, with electric headlights. It was contended there, as here, that if Georgia could prescribe electric headlights, other States through which the road ran might require lights of a different sort, and the result of various adjustments would be to delay interstate traffic. The court in that case held that although applicable to interstate traffic, the act was not directed against interstate commerce but indirectly affected it, and that the State is not to be denied, because of such indirect effect, the power to protect life and property within its limits. To like effect is *Chicago, Rock Island and Pacific Railway Co.* v. *Arkansas, supra.*

While none of the cases cited or herein discussed is entirely analogous on the facts, we think those cases which consider State exercise of police power for the safety of citizens of the State, bear a stronger analogy to the case before us on the facts, than do those in which the laws or orders bore a closer identity with regulation of interstate traffic as such. It does not appear that this order was directed against interstate commerce, nor does it deny equal protection of the laws. On its face, it must be taken as not so directed, but as the exercise of the power and duty inherent in the State to protect its citizens. It purports on its face to apply to train movements within the State, and the fact that it does affect interstate shipments or cuts of cars crossing from this State into the State of Missouri, results, in our opinion, under the facts of this case, in an incidental effect only upon interstate commerce.

Counsel for appellee say that the carrying out of this order would involve so large an expense as to affect its efficiency in the discharge of its duties as an interstate carrier. The question of expenses of labor involved and the purchase of cabooses was one of sharp dispute in the testimony. We are of the opinion that those expenses, on this record, are to be classed with those inconveniences referred to in the cases herein cited as not affecting the power of the

State to impose the regulation, unless so clearly unreasonable as to be beyond State power. This record does not so indicate.

Counsel for appellee also contend that the statutes governing the powers and duties of the Commerce Commission do not give jurisdiction to enter the orders here complained of. They cite section 90 of the Utilities act, (Ill. Rev. Stat. 1941, p. 2524,) which declares the act shall not apply to interstate commerce, except when specifically so stated and in so far as permitted by paramount Federal authority. It is not claimed, as we understand the argument, that the commission may not make orders in furtherance of the police powers of the State, but that it may not enter such orders as affect interstate commerce. As hereinbefore stated, the order complained of does not purport to regulate interstate traffic and its effect upon it is but incidental. As was pointed out in *New York, New Haven and Hartford Railroad Co.* v. *New York, supra,* and *Chicago, Rock Island and Pacific Railway Co.* v. *Arkansas, supra,* and other cases herein cited, inconveniences and incidental influence on interstate commerce do not mark the measure of the power of the State to protect its citizens. Appellee's contention cannot be sustained.

That there is substantial danger to switchmen that can be avoided by these cabooses or shelter cars, seems clear. We are of the opinion that the order of the Commerce Commission lay within the police power of the State; that such power has been delegated to that commission, to protect the lives, health and welfare of those engaged in the work of switching the cars on the runs carried out by the appellee, and that it was not beyond the power of the commission to enter finding No. 35 of its order requiring cabooses to the State line for those movements which crossed the bridges, and that such regulations do not directly burden interstate commerce.

The reasons and authorities cited in determining the validity of finding and order No. 35 must apply in the main to finding and order No. 34, which requires cabooses on interyard movements within the State. Much that has already been said in the consideration of this case applies to finding and order No. 34 and need not be repeated.

It is also argued that it was error to admit the testimony of one Thomas, an investigator for the commission. This contention is without merit. By section 60 of the Public Utilities act the commission is empowered to, on its own motion, conduct investigations. It follows that the commission may hear the results of such investigations.

We are of the opinion that the order of the commission as a whole was a valid exercise of the police power and that the circuit court erred in setting that order aside. The judgment of the circuit court is reversed and the cause is remanded to that court with directions to confirm the order of the Commerce Commission.

*Reversed and remanded, with directions.*