**Group Securities, Inc., Appellee, v. Charles F. Carpentier, Secretary of State, State of Illinois, Appellant.**

**Gen. No. 47,437.**

First District, First Division.
December 8, 1958.
Rehearing denied January 5, 1959.
Released for publication January 23, 1959.

Latham Castle, Attorney General of the State of Illinois (Theodore W. Grippo, Special Assistant Attorney General, of counsel) for defendant-appellant.

515

Pope & Ballard, of Chicago (Thomas C. Strachan, Jr., W. McNeil Kennedy, Willis S. Ryza, of Chicago, Putney, Twombly, Hall & Skidmore, of New York, of counsel) for plaintiff-appellee.

PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

The plaintiff under the provisions of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1955, chap. 121½, §§ 137.1–137.19) filed an application with the office of the Secretary of State for the registration of 21 classes of investment fund shares including two classes of shares known as the General Bond Fund and the Fully Administered Fund. A hearing was held to determine whether the application for the registration of shares of the General Bond Fund and the Fully Administered Fund should be allowed. After the hearing the Secretary of State issued his findings and decision and an order of denial of the said application for registration.

The plaintiff under the Administrative Review Act (Ill. Rev. Stat. 1955, chap. 110, §§ 264–279) filed a complaint to review the administrative decision and order issued by the defendant with respect to the investment fund shares. The trial court entered a judgment reversing and setting aside the findings, decision, and order of the Secretary of State, and from such judgment this appeal is taken.

The appeal was first taken to the Supreme Court of Illinois which, in Group Securities, Inc. v. Carpentier, 13 Ill.2d 41, held that the court did not have jurisdiction of the appeal because the constitutional questions raised were not passed on in the trial court, and the case was transferred here for determination.

Group Securities, Inc., hereafter referred to as the plaintiff, is an open-end investment company which offers for sale to the public 21 classes of investment

fund shares. All of the plaintiff's investment fund shares are sold through investment dealers by the underwriter, Distributors Group, Inc. Upon the sale of the securities to the public the issuer, the plaintiff, receives 91½% of the initial offering price, and the underwriter, Distributors Group, Inc., receives 8½% as a distribution charge, selling charge, sales commission or sales load. Out of the sum received by the underwriter the dealer gets 6%. The remaining 2½% is retained by the underwriter.

With respect to the securities involved in this appeal (the shares of the Fully Administered Fund and the General Bond Fund), the plaintiff entered into "Dealers' Continuing Compensation Contracts" with dealers whose clients hold these shares. These contracts provide for compensation to the dealer at the rate of one-fourth of 1% of the asset value of such shares which have been sold by the dealer and which are outstanding and registered on the books of the plaintiff. Such payments are made after the time of sale and are charged against current income of the two funds in question. These contracts recite that it is recognized that the dealer is a vital and continuing point of contact between the plaintiff and the dealer's customers, holders of the shares, and that the dealer is called upon to follow with diligence the progress of the plaintiff's affairs in the interest of his client and to supply counsel and information of various accounts to the said client during the said period that these shares are held by him. The additional payments to the dealers, paid annually, under these contracts are computed monthly based on the average daily asset value of the shares outstanding on the books of the corporation throughout the preceding month, and no payments shall be made for any month in which the average daily asset value of all such shares outstanding, sold by the dealer prior to the beginning of the month, is less than $25,000.

The contract provides for automatic termination if the dealer ceases to be qualified as a securities dealer under Federal or State laws. The plaintiff has interpreted this clause as meaning that this would be true even if the former dealer continues to act as an investment adviser and renders to his clients counsel and advice concerning the securities and further that the dealer does not actually have to perform services to enable him to collect.

The evidence shows that the amounts paid under these contracts for the Fully Administered Fund during 1952, 1953, and 1954 were $12,628, $12,373, and $12,675 respectively, and for the same periods the amounts paid under the General Bond Fund were $8,862, $7,789, $7,021. The Fully Administered Fund and the General Bond Fund are more permanent or longer-range investments than the other 19 classes of shares of the plaintiff.

Shares of the Fully Administered Fund and the General Bond Fund were originally registered and qualified for sale in Illinois on March 15, 1939 and October 4, 1943 respectively, and the shares of these two funds continued to be qualified for sale in Illinois until September 14, 1955. The dealer's continuing compensation contracts have been in existence only since the initial offering of the two funds.

On September 21, 1955 the Secretary of State of Illinois, hereafter referred to as the defendant, notified the plaintiff of an administrative hearing to be held to determine whether registration of securities of these two funds should be denied. The reasons specified were that the continuing compensation contracts were inequitable and tended to work a fraud and deceit, were violative of Section 7D of the Illinois Securities Act, and that the prospectus proposed for the sale of these securities failed to disclose material facts in connection with these contracts. Hearing was had on

October 11, 1955 before an Assistant Secretary of State, and on December 22, 1955 the defendant issued his written findings, decision and order denying the application for registration. He found that the continuing compensation contracts violated Section 7D of the Illinois Securities Act in that such payments constitute sales commissions, sales distribution compensation, sales charges, sales expenses or distributing charges paid in connection with the sales of the said shares; that such payments exceed 10% of the offering price of the securities and are not paid at the time of sale; that the prospectus failed to disclose material facts concerning the continuing compensation contracts and payments made thereunder; that the offering and sale of the shares of the said securities are inequitable because there is paid in connection with the sale and distribution of such shares certain continuing compensation payments which tend to prejudice the judgment and advice to his customers by a dealer because of such dealer's contingent financial interest in the sale of such shares and the continued effectiveness thereof. He further found that the contract imposed on the purchasers of such securities a charge for services which are ordinarily performed by dealers for their customers without charge and that it made no provision to insure that the purchasers would receive any such services, and that such contract necessarily influences the dealer to sacrifice the interests of his customers whenever such customer's interests conflict with those of the plaintiff.

The plaintiff contends that the interpretation by the defendant of Section 7D of the Securities Act is erroneous inasmuch as such section does not restrict or limit payments such as are here provided for, and that it limits only the relationship of the offering price of shares at the time of sale to the asset value that is received and invested by the issuer; that the findings

of the defendant are against the manifest weight of the evidence; that the plaintiff was denied a full hearing before the defendant; that there is no statutory sanction for a denial of, or a hearing on, an application for a renewal of registration filed in full compliance with Section 7I of the Illinois Securities Law.

The defendant contends that the plaintiff had violated Section 7D of the Illinois Securities Act of 1953 (Ill. Rev. Stat. 1955, chap. 121½, § 137.7D), which provides in part that no investment fund shares shall be registered unless the formula for determining the offering price is such that at the time of sale the market value of the unpledged underlying securities and other assets, after deducting all accrued liabilities and established reserve accounts, is at least 90% of such price. Upon the sale to the public of the two classes of shares herein involved the plaintiff received 91½% of the initial offering price. The Distributors Group, Inc. and the dealer received 8½% of the offering price. If this constituted the only sales charge or commission paid for the sale of such securities the plaintiff would receive a sum in excess of 91% of the total offering price of all such shares sold, and there would be no violation of the statute. The defendant, however, objected to the continuing compensation agreement and on the hearing held that such an agreement is an additional sales load or sales charge. Diligence of counsel has failed to provide, nor have we been able to find, any decision dealing with the specific question here involved. The only case cited which even remotely approaches the problem is Anchor Life and Accident Ins. Co. v. Taylor, 163 N. E. 631, 29 Ohio App. 428 (1928). This was a case involving an organization of an insurance company. The statute provided that the promotion and organization expenses of such companies shall not exceed 15% of the amount actually raised upon stock subscriptions. The insurance com-

pany in that case had filed articles of incorporation and before it was licensed stock was sold and an agreement was entered into under which all proceeds of the sale of stock were to be held in trust by a trust company except 15% thereof, which could be devoted to the expenses of promotion. In the promotion of the company the plaintiff had expended a sum greater than 15% of such proceeds and he brought that suit to recover for the value of the services. The plaintiff at the trial undertook to avoid the law's effect by saying he was not to be paid for his services until after the company was licensed. The court says:

"If a promoter can use 15 per cent. of the money paid in on stock subscriptions in partial satisfaction of the promotion expenses, and then incur debts which the corporation as soon as licensed is required to pay out of the funds theretofore immune, the statute is worse than useless. Such a statute would offer no protection at all to those whom it was designed to protect. Its presence on the statute books would be a decoy for credulous subscribers to stock, inducing in them the belief that 85 per cent. of their subscriptions was impounded for their benefit, when, in fact, it was only to be conserved until a license was obtained, at which time it would become a prey to those who had thus evaded the statute. Such an interpretation of the statute would make the statute itself an instrument of fraud."

■■ The plaintiff has no quarrel with the decision in that case, and admits that if in the instant case there had been an agreement that commissions should be subsequently paid out of the funds received by plaintiff in payment of the securities sold which would bring the aggregate sales load over 10% it would be a violation of the statute. But it urges that this rule is not here applicable inasmuch as the continuing compensation agreement is not an additional sales load

or sales charge but that it is a charge for services which are available to the investor and that it is a separate and distinct contract which cannot be tied in with the sale of the securities. Concerning statutory construction the Supreme Court in Scofield v. Board of Education, 411 Ill. 11, said:

"It is a generally accepted principle of statutory construction, and has been so held by this court many times, that in construing a statute or determining its constitutionality, all its sections are to be construed together in the light of the general purpose and plan, the evil intended to be remedied, and the object to be obtained, and if the language is susceptible of more than one construction, the statute should receive the construction that will effect its purpose rather than defeat it."

In People v. J. O. Beekman & Co., 347 Ill. 92, the court said: "The purpose of the Securities Act is to protect the public from deceit and fraud in the sale and disposition of securities within the State. (Stewart v. Brady, 300 Ill. 425.)"

██ The purpose of Section 7D was to protect the investors and to prevent fraud, deceit or irresponsible action on the part of the company offering securities to the public. Considering the intent of the legislature, there can be no doubt that an agreement entered into at the time of sale, under which the distributor or dealer would receive from the company at that time a sales charge or commission amounting to 10% of the asset value of the shares to be taken from the money paid by the customer for the shares, and further providing that subsequently the distributor or dealer would receive an additional commission annually for a period of years, would be a circumvention of the provisions of the Securities Act and it is inconceivable that it could be countenanced.

From the brief of the plaintiff it could be implied that it would agree that if the money which was to be subsequently paid was specifically designated at the time of the sale as commissions it would constitute a violation of the statute. In its brief the plaintiff says:

"It is, of course, implicit under the provisions of Section 7D, that the investment capital which the issuer receives upon the sale of its shares cannot subsequently be used as a supplemental payment for services performed in connection with the issuance and sale of the shares. Such a practice would indeed result in making the statutory purpose meaningless by permitting a dissipation of the shareholders' capital investment. It does not follow, however, that *bona fide* payments to dealers may not be made for services that they undertake to perform after the shares are sold, if the payments are charged exclusively against earnings as an ordinary operating expense." (Italics ours.)

Plaintiff's argument is that Section 7D applies only as a limitation on the relationship of the offering price to the asset value at the time of the sale and does not purport to regulate fees or commissions which a dealer may receive for services performed after the shares are issued and sold, provided that the agreement is made in good faith and not for the purpose of circumventing the statute, and if the payments are charged exclusively against earnings as an ordinary operating expense. Where the issuer of investment fund shares such as are involved here holds itself out as being engaged primarily in the business of investing, reinvesting or trading in securities, the profit received by the investor comes from the return realized by the company out of the basic securities bought and sold by it. The plaintiff concedes, and it is clearly evident, that if the initial money paid by the investor for securities purchased is reduced by deducting therefrom an amount in excess of 10%, the shareholder's capital

investment is impaired. It would seem to be equally evident that the value of the shares would also be reduced by subsequently deducting from the income of the securities company sums to be paid as additional commission to the distributors thereof, and this would be true without regard to the niceties of accounting practice in charging such payments as operating expenses. It has been said that the Securities Act is paternalistic. In re Estate of McCormick, 284 Ill. App. 543. Its purpose is to protect the purchaser of securities. The crucial question is whether the value of the shareholder's capital investment is impaired by such payments, and it is our opinion that such practice could definitely reduce the value of the purchased shares.

The next question is, as plaintiff states in its brief, was the contract before us one which provided for bona fide payments to dealers for services that they undertook to perform, or was it merely a subterfuge to secure to the dealer an additional commission and thus impose an additional sales load upon the sale of the securities. If it was the latter, then Section 7D was violated.

■■ The function of the court when reviewing a decision of an administrative agency is well settled. It is limited to a consideration of the record to determine if the findings and orders of the administrative agency are against the manifest weight of the evidence. Parker v. Department of Registration and Education, 5 Ill.2d 288; Adamek v. Civil Service Commission, 17 Ill.App.2d 11, and cases therein cited. At the hearing the Secretary of State found that the payments made under the continuing compensation contracts constituted sales commissions, sales distribution compensation, sales charge, sales expense or distributing expense paid in connection with the sale of the said shares. There was some conflict in the evidence taken

at the hearing. It was brought out that the services rendered to the customer under such contracts were performed by dealers with respect to the other 19 classes of Group Securities, Inc. as a matter of course with no additional compensation; that the contract provided that no payment shall be made with respect to these securities under the contract during any month in which the asset value of the shares of these funds outstanding on the dealer's books is less than $25,000; that the contract automatically terminated upon the dealer ceasing to be a registered securities dealer and that this was true even though he continued to render the identical service as an investment adviser. It is significant that the compensation to be paid the dealer is based only upon shares sold by him and not upon any of such shares in the possession of the customer no matter how acquired. The compensation is to be paid whether or not the dealer renders any services. There was testimony in the record from witnesses versed in security transactions that such payments could properly be classified as a sales expense or sales charge. The payments would be made to the dealer as long as the customer held the required number of shares even though the dealer had discontinued selling plaintiff's shares. The evidence in the record of the close tie-in between the continuing compensation contract and the sales of the securities was such that it could substantiate a finding by the trier of the fact that the said contract was not bona fide. It is not important to consider the amount of the payment. The controlling factor is that a contract of this type carries with it the potentiality of fraud and deception. The finding of the Secretary of State was not against the manifest weight of the evidence.

In support of its contention that the payments in question, since they are a charge against operating expenses, do not constitute a sales charge, the plaintiff

cites Transamerica Corporation v. United States, 65 F. Supp. 470, which is a case where a corporate taxpayer had organized a corporation to conduct an advertising and publicity program seeking to induce persons to become stockholders of the corporate taxpayer, but neither the corporate taxpayer nor the newly organized corporation bought for its own account or sold any stock in the corporate taxpayer under the plan. Amounts which were paid by the corporate taxpayer to employees of the newly organized corporation for soliciting orders for stock of the corporate taxpayer were deductible from its income as ordinary and necessary business expenses, in the nature of advertising and publicity expenses and were not capital expenditures in the purchase or sale of stock. This case is not applicable to the facts before us.

The Secretary of State also found that the payments made under the contract were inequitable because the continuing compensation payments would tend to prejudice the judgment and advice of the dealer to his customers since the dealer had a contingent financial interest in the sale of such shares. It is argued by the plaintiff that such a finding cannot stand since the seller is a dealer acting as a principal rather than as a broker or agent and hence owes no fiduciary obligation to his customers. This argument begs the question because the contract itself creates a fiduciary relationship irrespective of whether the seller of the securities is a dealer or a broker, and consequently it could be found that such a conflict of interest did exist. The finding of the Secretary of State on this point is not against the manifest weight of the evidence.

The plaintiff also argues that there is no statutory sanction for a denial of an application for a renewal of registration filed in compliance with Section 7I of the Illinois Securities Law or for a hearing in connection with such application. In support of that con-

526

tention it interprets the Illinois Securities Law as providing for a scheme of continuous registration for investment fund shares. It is its theory that once the shares have been initially registered the annual renewal of registration is merely a formal procedure, that all that is required in order to compel the Secretary of State to renew the registration is a compliance with Section 7I of the Act. That section provides for the filing of a renewal application not more than 30 nor less than 5 days before the annual expiration date, and that the application be in content and form in accord with the prescribed rules and regulations therefor, and provides for the payment of certain fees. Plaintiff further contends that if the Secretary of State at any time either after the initial registration or a renewal of registration believes that the law is being violated he has the right to proceed under Sections 11(H) and 11(I) of the Act. However, this contention does not take into account certain sections of the statute.

Section 7 of the Illinois Securities Law (Ill. Rev. Stat. 1955, chap. 121½, § 137.7) provides for the registration of investment fund shares and sets out the requirements therefor. Section 7E provides that the Secretary of State shall within a reasonable time examine the application and accompanying documents and unless he finds that the application and documents do not conform to the requirements of this section of the statute or "the sale of the investment fund shares would be inequitable or would work or tend to work a fraud or deceit upon purchasers thereof," he shall register such shares. Section 7H provides that a registration of investment fund shares, unless sooner terminated by the voluntary action of the applicant or by action of the Secretary of State under Section 11 of the Act, *shall continue in force and effect for a period of one year from the date of registration,* provided

that the issuer shall comply with certain requirements with reference to the filing of reports. Section 7I provides that a registration of "investment fund shares hereunder *may be renewed* by the applicant by filing with the Secretary of State not earlier than 30 days and not later than 5 days prior to the date upon which such registration or renewed registration would otherwise expire" (italics ours) an appropriate application, the form and content of which are to be prescribed by rule or regulation of the Secretary of State. This application is to be accompanied by an *examination fee of $25,* which shall not be returnable in any event. The section further provides that "if and when such renewal application shall have been approved by the Secretary of State for registration, such registration shall be renewed . . ." and there is a requirement that a renewal fee shall thereupon be paid.

█ We cannot construe the statute as a scheme for continuous registration as the plaintiff contends. The language of the statute indicates that such was not the legislative intent. It is provided that the initial registration shall continue in force and effect for a period of one year from the date of registration. It further provides that at the time when the application for renewal of registration is filed it must be accompanied by an examination fee of $25. Under the theory of the plaintiff that requirement would have no meaning. If the only reason for which the Secretary of State can refuse a renewal of registration is because of failure of the applicant to conform with Section 7I in filing the necessary application and paying the necessary fees, then it is evident that there would nor could not be any necessity or reason for an examination. Nor under such theory would there be any need for anything except a pro forma application without a requirement that its content be prescribed by the rules and regulations of the Secretary of State. Both of these require-

528

ments in the statute clearly indicate that any registration of securities is only for a term of one year and that further renewal is a matter within the discretion of the Secretary of State.

Section 11 (duties and powers of the Secretary of State) provides in subparagraph (F) that whenever it shall appear to the Secretary of State, either upon a complaint or otherwise, that the provisions of this Act or of any rule or regulation prescribed under authority thereof have been or are about to be violated, he may in his discretion either require or permit such person to file with the Secretary of State a statement in writing under oath or otherwise as to all the facts and circumstances concerning the subject matter which the Secretary of State believes to be in the public interest to investigate, and he may investigate such facts. Section 11(H) provides that "anything in this Act to the contrary notwithstanding, if the Secretary of State shall find that the sale or proposed sale or method of sale of any securities . . . is fraudulent, inequitable or would work or tend to work a fraud or deceit, or is being sold in violation of the provisions of Section 12, the Secretary of State shall by written order prohibit or suspend the sale of such securities or deny or revoke the registration of such securities." Section 11(I) provides that the Secretary of State "shall not deny, suspend or revoke the registration of securities . . . or prohibit or suspend the sale of any securities . . . accept [sic] after an opportunity for hearing upon not less than ten days notice given by personal service or registered mail to the person or persons concerned . . . The findings and decision of the Secretary of State upon the conclusion of each final hearing held pursuant to this subsection shall be set forth in a written order signed by the Secretary of State and shall be filed as a public record. All hearings shall be held before the Securities

Commissioner or a person designated by the Secretary of State, and appropriate records thereof shall be kept."

■■ The purpose of this section is to provide for a continuous supervision by the Secretary of State over shares registered under the provisions of the Act. If the contention of the plaintiff is correct, it would follow that if at the time of an application for a renewal of registration it appeared to the Secretary of State that the Act was being violated he must upon proper application being filed and fees paid renew the registration even though the next day he proceeds under Section 11(H) to suspend the registration. Section 11(I) provides that the Secretary of State shall not "deny," suspend or revoke the "registration" of securities. It is a reasonable construction of that section to interpret registration as meaning either initial or renewal registration and therefore the proceedings followed by the Secretary of State in the instant case were proper and in accord with the statute.

The plaintiff also argues that because the Secretary of State did not serve notice of the hearing until after he had failed to approve the renewal registration, by which action the sale of the shares was prohibited, the plaintiff was precluded from effectively seeking a stay order in the reviewing court of defendant's subsequent order of denial. However, the plaintiff has no absolute right to such a stay. Section 12 of the Administrative Review Act (Ill. Rev. Stat., chap. 110, § 275) sets out the powers of the Circuit or Superior Court in proceedings thereunder. Subparagraph (1) sets out that the Circuit or Superior Court shall have power (a) with or without requiring bond (except if otherwise provided in the particular statute under authority of which the administrative decision was entered) and before or after answer filed, upon notice to the agency and good cause shown, to stay the decision of the ad-

530

ministrative agency in whole or in part pending the final disposition of the case. Any stay under any circumstances is a matter within the discretion of the court. The registration of the shares involved by the plaintiff came to an end on September 14, 1955. After that date unless the Secretary of State determined that the registration of such shares could properly be renewed the plaintiff had no right to sell, nor was any such right conferred upon it by the provisions of the Administrative Review Act.

The plaintiff also argues that Section 7I does not set up standards which could be applied in granting or denying an effective registration, while sections 7A and 7E dealing with initial registration do set out such standards. However, we believe that Section 7I should properly be read in connection with Section 11 which, in 11(H), provides the necessary standards, that is, if the sale or method of sale of any securities is fraudulent, inequitable, would work or tend to work a fraud or deceit or the securities are being sold in violation of the provisions of Section 12. Such construction of the statute gives a sensible and intelligent meaning to every provision of the law.

 The shares of the Fully Administered Fund and the General Bond Fund, the securities herein involved, were originally registered and qualified for sale in Illinois in 1939 and 1943, respectively, and continued to be qualified for sale in Illinois until September 14, 1955. The plaintiff urges that because of that fact the Secretary of State had construed Section 7D of the Securities Law in accord with plaintiff's contention that it was solely a limitation upon the offering price and consequently did not apply to the "dealer's continuing compensation contracts." From the record it is apparent that objections had been raised by the office of the Secretary of State since 1943 and even if that were not true, that contention is

answered in Superior Coal Co. v. Department of Revenue, 4 Ill.2d 459, where the court held that the rules and regulations of an administrative department and its contemporaneous construction of a statute, if erroneous, are not binding upon the court and that the doctrine of collateral estoppel and contemporaneous construction cannot be invoked against the State of Illinois.

 The plaintiff also contends that it was deprived of a full hearing inasmuch as the hearing was held before an assistant Secretary of State and the administrative order was issued by the Secretary. We cannot consider any constitutional questions if any are herein involved. We can only construe the statute and determine if there was a substantial compliance with it, and we hold that the procedure set forth in the Act was followed in the proceedings herein.

The plaintiff in support of its contention cites Morgan v. United States, 298 U. S. 468 (1936), Morgan v. United States, 304 U. S. 1 (1938), and Communications Comm'n v. WJR, 337 U. S. 265. The question presented in the Morgan cases involved the validity of the order of the Secretary of Agriculture fixing maximum rates to be charged by market agencies at the Kansas City stockyards. In the first Morgan case the district court had struck from plaintiff's bills allegations that the Secretary had made the order without having heard or read the evidence and without having heard or considered the arguments submitted and that his sole information with respect to the proceeding was derived from consultation with employees of the Department of Agriculture. In that case the court held it was error to strike these allegations, that the defendant should be required to answer them, and that the question whether plaintiff had a proper hearing should be determined by the court. In the second Morgan case evidence was taken and the Secretary of Agriculture

testified that he did not hear oral argument, that he had not read the complete transcript of evidence, and that he accepted the findings of the men in the Bureau of Animal Industry. The court held that a "full hearing," a term which is used in the Act in question in that case, required the right to present evidence and to submit argument, and holds that the Secretary should not have accepted and made as his own the findings prepared by the prosecutors for the government without according a reasonable opportunity to the respondents in the proceeding to know the claims thus presented and to contest them. In Communications Comm'n v. WJR, supra, the court cites Morgan v. United States, 298 U. S. 468, as authority that a written argument in administrative hearings is sufficient. In its brief the plaintiff states that it had requested oral argument or the issuance of proposed findings and conclusions with an opportunity for the filing of exceptions and indicates that this will be found at page 59 of a supplemental abstract. We have no supplemental abstract in our files, nor was any transmitted to us, according to our records, at the time the Supreme Court transferred the case to this court. However, in examining the record we find that there was a letter sent to the Secretary of State by the attorneys for the plaintiff, dated November 4, 1955, in which they state they have enclosed copies of proposed findings of fact and conclusions of law and state that they renew their request to be permitted to file objections to the proposed or preliminary findings of fact and conclusions of law of the Secretary of State, and requesting an opportunity to present oral argument, with a further statement that a brief in support of the proposed findings of fact and conclusions of law will be mailed subsequently. The record contains the said documents referred to, together with a brief filed on the part of the attorney

for the Secretary of State in support of the denial of registration of the said shares.

The Act specifically provides in subsection (I) of Section 11, referring to the duties and powers of the Secretary of State, that a hearing to prohibit the sale of any securities shall be held before the "Securities Commissioner or a person designated by the Secretary of State." There is no requirement in the statute that any hearing be held before the Secretary of State personally, nor is there any provision made for oral argument. The presentation of briefs was sufficient. On a careful examination of the record in this case we hold that the procedure followed by the Secretary of State was in substantial compliance with the statute and that no prejudice thereby resulted to the plaintiff.

The judgment of the Circuit Court is reversed.

Judgment reversed.

ROBSON and SCHWARTZ, JJ., concur.