(No. 26697.— ▮▮▮▮▮▮)

BROTHERHOOD OF RAILROAD TRAINMEN, Appellee, *vs.* ELGIN, JOLIET AND EASTERN RAILWAY COMPANY, Appellant.

*Opinion filed January 19, 1943—Rehearing denied March 9, 1943.*

56

HARRY I. ALLEN, ROYAL B. CUSHING, and PAUL R. CONAGHAN, (KNAPP, CUSHING, HERSHBERGER & STEVENSON, of counsel,) for appellant.

ABRAM A. SCHWARZBACH, and ALVIN E. STEIN, for appellee.

GEORGE F. BARRETT, Attorney General, (ALBERT E. HALLETT, of counsel,) for the Commerce Commission. .

Mr. JUSTICE GUNN delivered the opinion of the court:

In February, 1939, an amended complaint was filed with the Illinois Commerce Commission by the Brotherhood of Railroad Trainmen against appellant, Elgin, Joliet and Eastern Railway Company, alleging that the latter had failed to supply and service its caboose cars with drinking water and ice in sanitary, practical and suitable containers, and also failed to furnish and supply sanitary and suitable drinking cups in the operation of its trains in the State of Illinois, and as the result of such failure the lives, health, safety and comfort of trainmen and switchmen riding in such cabooses were endangered. The parties will hereafter be referred to as the "brotherhood" and the "railway company."

To the amended complaint the railway company filed a motion to dismiss, which was argued before the taking of

testimony and denied by the commission. Thereafter an answer was filed alleging in substance there was no provision of the Public Utilities Act requiring a railroad to service its caboose cars with drinking water and ice, and that the commission had no power to decide what constituted suitable containers and suitable drinking cups. Evidence was heard before the commission and an order entered directing the defendant to maintain a drinking-water container of modern design, in each and every caboose car in the service on its railroad in Illinois, and to have supply men in the East Joliet yards fill the containers with drinking water, and supply ice and cups for a normal road trip.

The railway company filed an appeal to the circuit court of Cook county, which modified and revised the order of the commission. On appeal to this court, the case was remanded with directions to either affirm or set aside the order of the commission. (*Brotherhood of Railroad Trainmen* v. *Elgin, Joliet and Eastern Railway Co.* 374 Ill. 60.) On September 23, 1940, the circuit court of Cook county set aside the order of the commission. On its own motion the commission on September 24, 1940, reopened the proceeding; additional testimony was taken, and the order now complained of entered. The railway company filed with the commission its application for rehearing, which was denied on June 25, 1941. An appeal was taken to the circuit court of Cook county, and January 14, 1942, the circuit court affirmed the order of the commission, from which order the railway company now appeals.

The railway company is a common carrier. It operates a belt line from Joliet, Illinois, to Waukegan, Illinois, and from Joliet, Illinois, to terminals in South Chicago, Illinois, and Gary, Porter and Whiting, Indiana. It does not maintain passenger service. The length of the road operating to Waukegan is 75 miles, and that to South Chicago and Indiana points 56 miles. Transfer trains operate within

the vicinity of the terminals for distances of from one to five miles. All road trains and transfer trains carry cabooses. The conductor and one or two switchmen ride in the cabooses. Each caboose is. equipped with a small compartment lined with zinc, known as a water cooler. During summer months employees riding in the cabooses place ice and drinking water in these compartments. Ice is supplied at each terminal of the railway company in Illinois and Indiana. Trainmen riding in the caboose carry drinking water and ice to the caboose attached to their train; the bucket for the drinking water is supplied by the railway company. Some members of the crews riding in cabooses furnish their own drinking water. The railway company does not furnish paper drinking cups to its employees, but has offered to furnish each employee, riding in cabooses, with a thermos jug and an individual glass or cup. This was refused by the brotherhood.

There was no formal demand for the relief granted until the filing of the amended complaint. The evidence shows there was an agreement between the railway company and the trainmen relative to supplying ice and furnishing drinking water, which has been complied with by the railway company, and that there is no railroad in the United States that furnishes paper drinking cups to men working in cabooses. About fifteen trains a day depart from Joliet to points within the State of Indiana, and a like number of trains from East Joliet for points north. Eighty per cent of the freight carried by these trains originates outside the State of Illinois. Most of the ice obtained on the Indiana route is obtained at Porter, Indiana. There are 66 sources of drinking water on the railroad, and at least once a year water from each source is examined, in accordance with the requirements of the drinking-water standards set forth by the United States Public Health Service. The evidence discloses there are 118 caboose cars in operation on the railroad, and the

railway company claims that at no time has any employee been injured, or his health endangered on account of carrying ice and drinking water to caboose cars.

The brotherhood introduced evidence tending to show the water containers were unsanitary; that the upper part of the container was a sink, the waste pipe of which went through the ice container; that the water was kept in an open bucket, and sometimes food was stored in the same place. It also showed there were a great number of train movements in the yards over many tracks, and that the men in order to obtain their drinking water had to go distances varying from 375 to over 1200 feet across these tracks in all kinds of weather, and during the day and night. The commission found that more than 70 tracks were used to break up trains, switch and classify cars; that on each switch train there was a caboose and a train crew of conductor and brakeman; that in each caboose was a wooden ice box in which ice and a drinking-water bucket were placed, the top of which box consisted of a sink used as a wash basin, and having an open drain beneath, which extended along one side of the ice-water compartment; that the ice was obtained by trainmen from storage boxes located at the ends of the yards, and at points inaccessible for convenient use, and that in order to obtain ice and water it was necessary to cross tracks, where switching was being continuously carried on under all sorts of weather conditions, both night and day, which constituted a hazard to the men; that dust and dirt were frequently blown into open pails used to get water from the stores of supplies, and that the contamination of the drinking water and ice in the cabooses could only be precluded by the substitution of a drinking-water container in place of the ice boxes now in use; that the present ice boxes are unsanitary and a hazard to the common health, comfort and safety; and that a common ladle or drinking cup is frequently used in connection with the unsanitary containers; and that im-

pairment of health, comfort and safety of the trainmen by reason of the conditions described may materially affect the health, safety and comfort of the public in general, as well as other trainmen.

The railway company raises many objections to the order of the commission, the first of which is that its order is in conflict with the Public Health Acts of Congress. This point is raised for the first time in this court. It is not set out in any of the motions, nor is it contained in the motion for rehearing presented to the Commerce Commission. Section 67 of the Public Utilities Act (Ill. Rev. Stat. 1941, chap. 111⅔, par. 71,) among other things provides: "No appeal shall be allowed from any rule, regulation, order or decision of the Commission unless and until an application for a rehearing thereof shall first have been filed with and acted upon by the Commission. No person or corporation in any appeal shall urge or rely upon any grounds not set forth in such application for a rehearing before the Commission." Appeals from orders of the Commerce Commission are purely statutory, and to become legally effective they must be prosecuted in accordance with the requirements of the statute. (*Village of Waynesville* v. *Pennsylvania Railroad Co.* 354 Ill. 318.) This point, not having been preserved in the manner required by statute, is not available to the appellant in this court.

The second point raised by the railway company is that the order of the commission burdens and obstructs interstate commerce. It is true that the switching operations of cabooses carry them across the State line into Indiana, but the order of the commission is limited to their cabooses in service upon appellant's railroad in Illinois. A great number of authorities are cited by both parties on this point, but it is only necessary to advert to the fact that both this court and the Supreme Court of the United States have held that the State, by virtue of its inherent and reserved police power, may enact laws promoting the peace

and good order of society, for the preservation of life and health, or conducive to the comfort, convenience and welfare of the people, notwithstanding acts coming within such police power operate on the movements of interstate commerce and persons engaged therein, unless its effect is to directly lay some burden or restriction on interstate commerce which would not otherwise exist; and that when such regulations only incidentally affect interstate commerce they are not in conflict and repugnant to any action taken by the Federal Congress.

The latest decision of this court is that of *Brotherhood of Railroad Trainmen* v. *Terminal Railroad Ass'n,* 379 Ill. 403, in which we held that an order of the Commerce Commission, requiring shelter cars within the State of Illinois upon trains moving across the Mississippi river, were not a direct burden upon interstate commerce, notwithstanding the fact that it is necessary to haul said cars some distance into the State of Missouri before they can be returned to the Illinois terminal. (*Terminal Railroad Ass'n* v. *Brotherhood of Railroad Trainmen,* U. S. 218, Oct. term 1942, 87 L. ed. 369.) Another pronouncement of the Supreme Court of the United States is that of *State of California* v. *Thompson,* 313 U. S. 109, 85 L. ed. 1221. In that case the law of California required a person dealing in tickets for transportation companies to secure a license to engage in such business, and failure to procure such license is a misdemeanor. The respondent was convicted because he had arranged for the transportation of passengers to Dallas, Texas, from Los Angeles, California, and the question involved was whether a conviction should be set aside because the act directly interfered with interstate commerce. In holding that the California law was not, for this reason, void, the court said: "As this court has often had occasion to point out, the commerce clause, in conferring on Congress power to regulate commerce, did not wholly withdraw from the States the power to regulate matters of local con-

cern with respect to which Congress has not exercised its power, even though the regulation affects interstate commerce. Ever since *Wilson* v. *Black Bird Creek Marsh Co.* 2 Pet. 245, and *Cooley* v. *Port Wardens,* 12 How. 299, it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce, but which because of their character and their number and diversity may never be adequately dealt with by Congress. * * * Notwithstanding the commerce clause, such regulation in the absence of Congressional action has, for the most part, been left to the States by the decisions of this court, subject only to other applicable constitutional restraints."

It then calls attention to numerous instances of State regulations which have been upheld such as: A State may license trainmen engaged in interstate commerce in order to insure their skill and fitness, (*Smith* v. *Alabama,* 124 U. S. 465, 31 L. ed. 508;) it may define the size of crews manning interstate trains, (*Chicago, Rock Island and Pacific Railroad Co.* v. *Arkansas,* 219 U. S. 453; *Missouri Pacific Railroad Co.* v. *Norwood,* 283 U. S. 249;) it may require interstate passenger cars to be heated and guard posts to be placed on bridges of an interstate railroad, (*New York, New Haven and Hartford Railroad Co.* v. *New York,* 165 U. S. 628;) it may pass local quarantine laws applicable to merchandise moving in interstate commerce as a means of protecting local health, (*Morgans, L. & T. R. & S. S. Co.* v. *Louisiana,* 118 U. S. 455.) Other illustrations are cited in the opinion, and it concludes: "If there is authority in the State, in the exercise of its police power, to adopt such regulations affecting interstate transportation, it must be deemed to possess the power to regulate the negotiations for such transportation where they affect matters of local concern, which are in other respects within State regulatory power, and where the regulation does not infringe the national interest in maintaining the free flow

of commerce and in preserving uniformity in the regulation of commerce in matters of national concern."

Without analyzing all of the cases cited by both parties, these two are decisive, and if it is within the power of the Commerce Commission to enter the order complained of, its effect upon interstate commerce is only indirect, and not in violation of the commerce clause of the constitution of the United States.

Appellant also urges that the order of the Commerce Commission violates section 90 of the Public Utilities Act, (Ill. Rev. Stat. 1941, chap. 111⅔, par. 94,) which, among other things, provides: "Neither this Act nor any provision thereof shall apply or be construed to apply to commerce with foreign nations or commerce among the several states of this Union, except when specifically so stated.  *  *  *" The same point was raised in *Brotherhood of Railway Trainmen* v. *Terminal Railroad Ass'n, supra,* and it was there held that this section had no application because the effect upon commerce was incidental, which is not sufficient to limit the measure of the power of the State to protect its citizens.

It is also claimed that the Health and Safety Act (Ill. Rev. Stat. 1939, chap. 48, par. 137,) grants to the Industrial Commission of Illinois exclusive jurisdiction over matters relating to health and safety of employees, and consequently by implication has repealed the provisions of the Public Utilities Act authorizing the Commerce Commission to require public utilities to adopt measures affecting the health and safety of its employees and the public. This act makes it the duty of every employer to provide reasonable protection for the lives, health and safety of all persons employed, to effectuate its purpose. The Industrial Commission is authorized to make rules governing all employment. It is not pointed out how this act is inconsistent with the Public Utilities Act. It takes the place of the former act providing for the health, safety and com-

fort of employees in factories, mills and work shops. (Ill. Rev. Stat. 1935, chap. 48, pars. 143-174.) This act affects employees only, whereas the Public Utilities Act applies to both employees and the public. It authorizes the making of rules and penalties for violating them, but makes no provision for installing of safety devices, improvements, appliances, etc., such as is authorized by the Public Utilities Act. Counsel have not pointed out the irreconciliable conflict supposed to exist.

Repeals by implication are not favored, and the intention to repeal will not be presumed unless there is such a clear repugnance between two laws and their provisions that they cannot both be carried into effect. (*Kizer* v. *City of Mattoon,* 332 Ill. 545.) And it is not sufficient to justify an inference of repeal that the subsequent statute covers some, or even all, of the questions covered by the former. There must be an irreconcilable repugnancy. (*Seagram-Distillers Corp.* v. *Old Dearborn Distribution Co.* 363 Ill. 610.) Statutes which are seemingly repugnant should, if possible, be so construed that the subsequent act may not operate to repeal by implication the earlier act. (*City of Geneseo* v. *Illinois Northern Utilities Co.* 378 Ill. 506; *People ex rel. Mathews* v. *Board of Education,* 349 id. 390; *People* v. *Shader,* 326 id. 145.) In *Village of Glencoe* v. *Hurford,* 317 Ill. 203, we said: "It is a well-established rule in construing statutes, that when great inconvenience or absurd consequences will result from a particular construction, that construction should be avoided unless the meaning of the legislature be so plain and manifest that avoidance is impossible." We find nothing in the Health and Safety Act that indicates an intention upon the part of the legislature to repeal the authority granted the Commerce Commission over public utilities.

It is also urged that section 57 of the Public Utilities Act, (Ill. Rev. Stat. 1941, chap. 111⅔, par. 61,) is void because the matter provided in this section is not expressed

in the title of the act. Section 57 is one of those defining the power of the Commerce Commission, and authorizes it to establish rules or regulations to require public utilities to operate their plants and equipment in such a manner as to safeguard all of their employees, passengers, customers and the public, and to prescribe the installation of appropriate safety devices and appliances, or other acts,. which the health and safety of the employees or the public may demand.

In *People ex rel. City of Chicago* v. *Board of County Commissioners,* 355 Ill. 244, we said: "Section 13 of article IV of the constitution provides that no act shall embrace more than one subject, and that shall be expressed in the title. The term 'subject,' in a constitutional provision of this character, is given a comprehensive meaning. It may be as broad as the legislature chooses to make it so that a single act may include all matters which have a logical or natural connection. Provisions of an act which relate, directly or indirectly, to its general subject, do not render the act vulnerable to the objection that it embraces more than one subject. Since an act may contain all matters germane to its general subject, it may include the means reasonably necessary or appropriate to the accomplishment of its purpose. The constitutional provision is not a limitation on the comprehensiveness of the subject; and to encounter the prohibition of plurality of subjects, an act must embrace discordant provisions that by no fair intendment can be considered as having any legitimate relation to each other. [Citations.] Many acts comprising numerous sections have very broad titles. * * * 'An act concerning public utilities;' * * * Each of these acts contains numerous provisions which, although not specifically indicated in the general title to the act,.are related to or have some connection, more or less direct, with the subject of legislation."

In *Lasdon* v. *Hallihan,* 377 Ill. 187, it was held that the subject of the act, as that term is used in the constitution, means the matter or thing forming the groundwork of the act, and may include many provisions that are germane to it, and are such that, if traced back, will lead the mind to the subject as the generic head. And in *Public Service Co. of Northern Illinois* v. *Recktenwald,* 290 Ill. 314, we held the title of an act is not required to be an index of the body of the act, or as comprehensive in matters of detail, but if it fairly indicates the general subject and reasonably covers all the provisions of the act, and is not calculated to mislead the General Assembly or the people, it is a sufficient compliance with the constitutional requirement. Section 57 of the Public Utilities Act does not in our opinion offend section 13 of article IV of the constitution of the State of Illinois.

It is next claimed that the Commerce Commission has no power to enter an order directing the installation of specific types of equipment and supplies upon caboose cars or railroads, because it is said the power granted by the statute is so indefinite as to be void for uncertainty. Appellants assume the only authority for the entering of the order complained of is section 57 of the act, but examination discloses there are several sections which deal with the power of the commission to require proper instrumentality and equipment upon the part of public utilities. Section 32, (Ill. Rev. Stat. 1941, chap. 111⅔, par. 32,) provides: "Every public utility shall furnish, provide and maintain such service, instrumentalities, equipment and facilities as shall promote the safety, health, comfort and convenience of its patrons, employees, and public and as shall be in all respects adequate, efficient, just and reasonable." Section 49 authorizes the commission if it finds that equipment, appliances, facilities or service of any public utility are insufficient, improper or inadequate to determine "the

just, reasonable, safe, proper, adequate or sufficient rules, regulations, practices, equipment, appliances, facilities, service or methods to be observed, furnished, constructed, enforced or employed, and it shall fix the same by its order, decision, rule or regulation." Section 57 grants the commission the power "to require every public utility to maintain and operate its plant, equipment or other property in such manner as to promote and safeguard the health and safety of its employees, passengers, customers, and the public * * * and to require the performance of any other act which the health or safety of its employees, passengers, customers or the public may demand."

In *Brotherhood of Locomotive Firemen and Enginemen* v. *Mobile and Ohio Railroad Co.* 362 Ill. 122, an order of the commission requiring the railroad company to install switch lights on the main-track switches was upheld by this court by reason of the authority granted in section 32 and section 50 of the Public Utilities Act. In *Chicago Motor Coach Co.* v. *City of Chicago,* 337 Ill. 200, in commenting upon the power granted the Commerce Commission by these various sections, we said: "The language of the act is sufficiently comprehensive to subject every phase of the relations between every public utility and the public to the supervision and regulation of the Public Utilities Commission. The Commission was invested with the supervision of all public utilities, authorized to fix the safe, proper or adequate equipment to be employed, to direct additions, improvements or changes to be made, to determine the just, reasonable, safe, proper, adequate or sufficient rules, regulations, practices, equipment, appliances, facilities, service or methods to be observed, furnished, constructed, enforced or employed, and to fix them all by its order, decision, rule or regulation, and every public utility was required to comply with every order, decision, rule and regulation of the commission. These provisions certainly covered the whole field of service of every utility." Finally, in *Chicago,*

*Burlington and Quincy Railroad Co.* v. *Commerce Com.* 364 Ill. 213, an order of the Commerce Commission requiring a railroad to build a stairway to enable employees to reach a yard office, so as to avoid crossing a number of tracks on an embankment, was upheld by this court. In that case the claim was made that the commission was without jurisdiction to enter the order because there was nothing in the statute to authorize it, but the court had no difficulty in finding that such authority was granted under sections 50 and 57 of the Public Utilities Act, which expressly authorize regulations for the safety of employees. This contention of appellants cannot be sustained.

It is also contended that by not specifying the particular things that may be authorized, and the specific manner in which they are to be installed that legislative power was delegated to the Commerce Commission. In this respect we have said "The maxim that a legislature may not delegate legislative power has some qualifications, as in the creation of municipalities, and also in the creation of administrative boards to apply to the myriad details of rate schedules the regulatory police power of the State. The latter qualification is made necessary in order that the legislative power may be effectively exercised. In creating such an administrative agency, the legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function. It is a wholesome and necessary principle that such an agency must pursue the procedure and rules enjoined and show a substantial compliance therewith to give validity to its action." *Chicago Railways* v. *Commerce Com.* 336 Ill. 51.

The Public Utilities Act requires a complaint, notice, hearings and evidence, and gives opportunity for review, and the utility has the opportunity at every step of the proceeding to be heard and to present its objections. If the position claimed by appellant were sound the commis-

sion would be rendered ineffective, because every time some new phase of utility operation affecting public safety were involved it would require a specific act of the legislature, applying to such particular object. Such a rule would prevent the commission from discharging its essential duties in the public interest, and would, in effect, overrule our previous construction of the act in many cases. We find this point without merit.

A number of other points are discussed in the briefs, which we have fully considered and which we refrain from discussing to avoid undue length of this opinion.

We are of the opinion the order and findings of the Commerce Commission were justified by the evidence and authorized by the statute, and the judgment of the circuit court of Cook county sustaining the order of the commission is affirmed.

*Judgment affirmed.*