SOUTHERN ILLINOIS ASPHALT COMPANY, INC., Petitioner, *v.* THE ENVIRONMENTAL PROTECTION AGENCY *et al.*, Respondents.

(No. 71-163;

Fifth District—October 10, 1973.

G. MORAN, P. J., dissenting.

Craig & Craig, of Mt. Vernon, (Howard W. Campbell and Terry Black, of counsel,) for petitioner.

William J. Scott, Attorney General, of Springfield, (Larry R. Eaton, Assistant Attorney General, of counsel,) for respondent.

Mr. JUSTICE CREBS delivered the opinion of the court:

Southern Illinois Asphalt Company, Inc., appeals from an order by the Illinois Pollution Control Board which found it guilty of violating the Environmental Protection Act (Ill. Rev. Stat., ch. 111½, par. 1001) and certain rules established by the Board under such Act, ordered it to cease and desist operations of its newly constructed asphalt plant at McLeansboro, Illinois, and fined it $5000 for its failure to obtain a permit for the construction of the plant and the installation of pollution control equipment.

Appellant contends that the ruling of the Board is contrary to the manifest weight of evidence; that the Act itself is unconstitutionally vague and violative of the equal protection and due process clauses of the United States Constitution; that the legislative granting of power to the Board to impose monetary penalties constitutes an unlawful delegation of judicial powers to an administrative agency; that the cease and desist order was issued without authority even under the Board's own rules and regulations; and that the procedures established by the Board for hearing enforcement matters are violative of the constitutional right to due process.

The basic facts are undisputed. In the summer of 1970, with the cooperation and encouragement of the city council, appellant constructed an asphalt plant in McLeansboro. It began operation in late summer and

employed about fifty men with a weekly payroll of approximately $16,000. Admittedly, it did not obtain an installation permit prior to construction of its plant, as required by the Act, but such failure was not wilful. It had previously built an asphalt plant in Mt. Vernon and in that instance the company that furnished the pollution control equipment applied for and obtained the permit. At McLeansboro each company mistakenly assumed that the other had made the appropriate application. As a result the plant was completed and it began operating and continued to do so throughout the fall without anyone being aware of the absence of an installation permit. Subsequently a number of neighbors began to complain particularly about the noise and disruptive effect of the company trucks using a city street which was the only access to the plant. Again with the cooperation of the city, additional land was purchased and a new access was constructed directly to the plant from the highway. It was at this time that the company itself discovered that no one had applied for an installation permit so it then proceeded to do so.

On February 26, 1971, the Environmental Protection Agency denied appellant's application, and two days later filed a complaint charging it with failure to obtain an installation permit, and also, with operating an asphalt plant without an operating permit. At the hearing held on April 28, 1971, before a hearing officer, the Agency presented only two witnesses neither of whom testified as to whether an installation permit had ever been issued. However, Mr. Paul Schmierbach, an enforcement officer for the Agency, did testify that he had visited the plant twice while it was operating and that in his opinion the plant met all technological standards required by law or regulation for pollution control. The Agency's other witness, Mr. Clyde Bassett, testified that he too had visited the plant on two occasions and that it was one of the cleanest plants he had ever seen, and that he did not see any particulate matter emitted from the smoke stack. Testifying for appellant, Mr. James Morton, an employee of the pollution control equipment manufacturer, stated that under the Board's new regulations the permissible particulate emission per hour for an asphalt plant of the same capacity would be approximately 56 lbs.; that under the worst possible conditions the equipment installed in appellant's plant would not permit in excess of 41 lbs. of particulate emission per hour, and that in similar plants in similar conditions the emission did not exceed 11 lbs. and could be controlled to 5 lbs.

On June 10, 1971 the Board issued its order as follows: "We find Respondent guilty of violating Section 9(b) of the Act and Rule 3—2.110 of the Rules and Regulations governing the control of air pollution.

We order Respondent to cease and desist all operation of its plant at its present location without a permit. We impose a fine of $5000 on Respondent for its unexcused failure to obtain a permit. We find Respondent not guilty of the charge of operating an asphalt plant without a permit because no regulations had been adopted requiring an operation permit as distinguished from an installation permit."

The Environmental Protection Act was adopted by the legislature and became effective July 1, 1970. *Section 5* of the Act created the Pollution Control Board and empowered it to determine, define and implement the environmental control standards applicable in the State of Illinois, to adopt rules and regulations in accordance with Title VII of the Act, and to conduct hearings upon complaints charging violations. *Section 9* of the Act requires that "no person shall * * * (b) construct, install or operate any equipment, facility * * * capable of causing or contributing to air pollution or designed to prevent air pollution of any type designated by Board regulation, without a permit granted by the (Environmental Protection) Agency." *Section 3(b)* of the Act defines air pollution as "the presence in the atmosphere of one or more contaminates in sufficient quantities and of such characteristics and duration as to be injurious to human, plant, or animal life, to health, or to property, or to unreasonably interfere with the enjoyment of life or property." *Subsection (d)* defines contaminate as "any solid, liquid or gaseous matters, any odor, or any form of energy, from whatever source."

*Rule 3—2.110* of the Board's Rules and Regulations provides that "A permit shall be required * * * for installation or construction of new equipment capable of emitting air contaminates to the atmosphere and any new equipment intended for eliminating, reducing or controlling emission of air contaminates."

We shall first consider appellant's contention that Sections 3(b) and 9(b) of the Act are unconstitutional because they make a wrongful delegation of legislative authority to an administrative board, and because their meaning is vague and undefined relative to the definition of air pollution. It is argued that when the law leaves to the discretion of an administrative office the definition of what the law shall be and to whom it shall apply, it is invalid as an unwarranted and void delegation of legislative power to an administrative officer. (*Vallat v. Radium Dial Co.*, 360 Ill. 407.) Further it is contended that to fulfill the constitutional requirements of due process and separation of powers a statute must be complete, definite and certain when it leaves the legislature and must inform persons to be governed by it of its meaning and application. (*People v. Hurley*, 402 Ill. 562.) Appellee concedes that a legislative body cannot delegate its own inherent function to declare the

law but argues that it may delegate to others certain powers which it might properly, but cannot advantageously, do itself. (*Brotherhood of Railroad Trainmen v. Elgin, Joliet and Eastern Ry.*, 382 Ill. 55.) It also argues that the Act provides sufficient standards and that the word "pollution" is generally understood and is definite and certain. *Metropolitan Sanitary Dist. v. United States Steel Corporation*, 41 Ill.2d 440.

The constitutionality of these sections has not previously been determined in Illinois, but an extensive review of similar questions arising in analogous cases leads us to the conclusion that they are sufficient to sustain such an attack.

In *Brotherhood of Railroad Trainmen v. Elgin, Joliet and Eastern Ry.*, 382 Ill. 55, the railroad challenged an order to the Illinois Commerce Commission requiring it to install certain equipment and supplies. Section 32 of the statute (Ill. Rev. Stat. 1941, ch. 111⅔) provided that "Every public utility shall furnish, provide and maintain such service, instrumentalities, equipment and facilities as shall promote the safety, health, comfort and convenience of its patrons, employees, and public and as shall be in all respects adequate, efficient, just and reasonable." Section 49 authorized the commission, if it found that equipment, appliances, facilities or service of any public utility were insufficient, improper or inadequate to determine "the just, reasonable, safe, proper, adequate or sufficient rules, regulations, practices, equipment, appliances, facilities, service or methods to be observed, furnished, constructed, enforced or employed, and it shall fix the same by its order, decision, rule or regulation." Section 57 granted the commission the power "to require every public utility to maintain and operate its plant, equipment or other property in such manner as to promote and safeguard the health and safety of its employees, passengers, customers, and the public * * * and to require the performance of any other act which the health or safety of its employees, passengers, customers or the public may demand." The court rejected the railroads' contention that the powers so granted to the commission were "so indefinite as to be void for uncertainty", and cited three previous cases in which the court had sustained the act. Quoting from *Chicago Motor Coach Co. v. Chicago*, 337 Ill. 200, the court stated that the statute was broad enough "to subject every phase of the relations between every public utility and the public to the supervision and regulation of the Public Utilities Commission."

The second contention of the railroad was that the statute delegated legislative authority to the commission by not specifying the particular things which could be authorized and the specific manner in which they were to be installed. In rejecting this argument, the court stated:

"The Public Utilities Act requires a complaint, notice, hearings

and evidence, and gives opportunity for review, and the utility has the opportunity at every step of the proceeding to be heard and to present its objections. If the position claimed by appellant were sound the commission would be rendered ineffective, because every time some new phase of utility operation affecting public safety were involved it would require a specific act of the legislature, applying to such particular object. Such a rule would prevent the commission from discharging its essential duties in the public interest, and would, in effect, overrule our previous construction of the act in many cases. We find this point without merit."

In *Hill v. Relyea*, 34 Ill.2d 552, Section 10—6 of the Mental Health Code was attacked as too vague a delegation of authority. The section gave the supervisor of a mental hospital authority to release a patient "as the welfare of such person and the community may require." The court stated the general rule to be:

"Absolute criteria whereby every detail necessary in the enforcement of a law is anticipated need not be established by the General Assembly. The constitution merely required that intelligible standards be set to guide the agency charged with enforcements, (*Memorial Gardens Ass'n v. Smith,* 16 Ill.2d 116; *People v. Warren,* 11 Ill.2d 420,) and the precision of the permissible standard must necessarily vary according to the nature of the ultimate objective and the problems involved. *Board of Education v. Page,* 33 Ill.2d 372; *People ex rel. Daesch v. Mayor of Belleville,* 22 Ill.2d 226."

The court then applied the general rule to the statute as follows:

"In this case the legislature gave the superintendent of the hospital the power and authority to discharge patients 'as the welfare of such person and the community may require'. The legislature has determined who shall discharge patients and the criteria for discharge but it has granted authority to the Department of Mental Health and to the hospital superintendent to use discretion in executing the law and in granting the discharge. This discretion must be exercised within the standard set forth by the General Assembly. The difficulty in attempting to establish more precise legislative standards is readily apparent. The superintendent of the hospital and his staff examine, work with and treat the hospitalized person. They can determine more understandingly and advantageously when the welfare of the person and of the Community may require a discharge or continued hospitalization of such person. Therefore it is desirable to grant to the super-

intendent and the Department the authority to discharge hospitalized persons and the discretion as to when the welfare of such person requires it. The nature of the objects to be achieved and the problems to be solved negate the usefulness of setting more precise legislative standards. *Board of Education v. Page,* 33 Ill.2d 372.

The legislature has conferred authority and discretion as to the execution of a law. The authority and discretion is to be exercised under and in pursuance of the standard, 'as the welfare of such person and the community may require,' which is found in section 10—6. This is a proper delegation of administrative authority."

In *Dept. of Public Wks. and Bldgs. v. Lanter,* 413 Ill. 581, the constitutionality of the Freeways Act was challenged. The court stated:

"It is true that the standards prescribed in the present statute to govern the Department in the designation of freeways and the regulation of the access rights are expressed in general terms—'when the safety and convenience of highway traffic will be promoted and the public interest subserved thereby.' But it is also true that the host of varied and unforeseeable conditions which may exist or arise along the State's thousand of miles of through traffic highways makes greater particularity impossible. The constitutional doctrine of separation of powers was not intended to confine the legislature to the alternatives of complete inaction or the imposition of rigidly inflexible laws which would distort, rather than promote, its objective. When it is necessary, the legislature may commit to others the responsibility for the accomplishment of the details of its expressed purpose."

In *Metropolitan Sanitary Dist. v. United States Steel Corp.,* 41 Ill.2d 440, section 7aa of the Chicago Sanitary District Act was involved. This section gave the District authority and power to prevent pollution of any waters from which a water supply could be obtained. The circuit court had issued an injunction restraining further pollution, and the Illinois Supreme Court affirmed, stating:

"The defendant also urges that section 7aa is unconstitutionally vague because it does not define the term 'pollution'. But the action authorized by the statute closely resembles the established suit in equity to restrain, as a nuisance, the pollution of a water supply (see, *Martin v. Gleason* (1885), 139 Mass. 183; *City of Baltimore v. Karren Mfg Co.* (1882) 59 Md. 96; Anno. 72 A.L.R. 673), and we are satisfied that such a statutory authorization need not delineate, with scientific precision, the characteristics of

all types of pollution. We are concerned in this case only with the emission of oil in quantities sufficient to form a visible floating mass. The deleterious consequences of such a mass were described in the record, and that testimony has not been controverted."

■■ In the case before us we are involved with air pollution control, a subject which is fairly new to the law and yet more and more important to the public welfare. By its very nature it defies the establishment of precise standards. It involves a highly specialized science, and yet covers an exceedingly broad spectrum. It is complex and not reducible to easy equations, particularly in view of our constantly growing knowledge and understanding of our environment and its effect upon our lives and our very existence. Recognizing these facts the legislature acted to prohibit or control air contamination to the extent possible in the interest of health and the enjoyment of life or property. It is true that the standards set forth are broad, but they are nonetheless adequate. Section 9(b) gives the Board the right to regulate, through granting or refusing a permit, any facility capable of causing or contributing to air pollution. Section 3(b) defines air pollution as the presence in the atmosphere of contaminates in sufficient quantities and of such characteristics and duration as to be injurious to life and health, or to unreasonably interfere with the enjoyment of life or property. Subsection (d) then defines contaminates. We find these standards intelligible and in themselves sufficient to guide the Board in its enforcement of the law, and, therefore, we conclude that the authority granted to the Board to accomplish the purpose of the law was constitutionally permissible.

We also find that the term "air pollution", as defined by the Act, is definite and understandable and not vague and indefinite as contended by appellant. Clearly, pollution is limited to a contamination of the atmosphere by any substance, *sufficient in quantity, characteristics and duration as to be injurious to life and health, or to unreasonably interfere with the enjoyment of life and property.* In view of the broad range of the subject matter a more precise definition could hardly be constructed.

Persuasive of our conclusions with reference to the above are a number of cases from other jurisdictions. In *Houston Compressed Steel v. Texas* (1970), 456 S.W.2d 768 the Texas Clean Air Act was challenged and it was contended that the definition of air pollution was too vague. The court stated:

"* * * The science of air pollution control is new and inexact, and these standards are difficult to devise, but if they are to be effective they must be broad. If they are too precise they will

provide easy escape for those who wish to circumvent the law." The court then quoted the definition, which is almost identical with ours, and stated that the definition is clear and is easily capable of understanding.

*Air Pollution Com. v. Coated Materials* (Pa. 1970), 1 Env. Rep. 1444 92 Dauph Co. Rep. 274, involved a similar challenge to the Pennsylvania Air Pollution Control Act. The Act defined air pollution as some substance "* * * which unreasonably interferes with the comfortable enjoyment of life or property." The court, in upholding the statute, stated:

> "Surely, the present contention that the definition of 'air pollution' is uncertain and not susceptible to acceptable standards of proof cannot stand. The language employed in the statute is equivalent to the definition of nuisance which is certainly firmly established in the law."

See also *Bortz Coal Co. v. Air Pollution Com.*, 2 Pa. Cmwlth. 441, 279 A.2d 388, 48 A.L.R.3d 311.

In *Dept. of Health v. Owens-Corning Fiberglass Corp.* (N.J. 1970), 100 Su. 366, 242 A.2d 21, the court was faced with the argument that their Pollution Control Act was an invalid delegation of legislative power to the administrative body. The court stated at page 30:

> "The Air Pollution Control Act of 1954 does not offend the requirement that there be sufficient standards for the guidance of the administrative agency. In its definitive sense, 'air pollution' is in itself a standard, albeit a broad one. That aside, an entirely adequate standard appears in the very definition of 'air pollution' contained in the N.J.S.A. 26; 2c—2. By force of that definition, contamination of the air may be prohibited or controlled only under specifically defined circumstances, namely, where there is proof of injury to health or unreasonable interference with the comfortable enjoyment of life and property."

In *State v. Schuster's Express, Inc.*, 266 A.2d 902, the court upheld the constitutionality of a statute providing that the engine of every motor vehicle should be so equipped as to prevent "excessive" fumes or exhaust smoke. In doing so, the Connecticut court cited *People v. Madearos*, 230 Cal.App.2d 642, 41 Cal.Rptr. 269, which upheld an "excessive" smoke and noise statute, finding that the terms employed were not so indefinite and uncertain and vague that they failed to inform a person of ordinary and average intelligence of what acts or omissions it declared to be prohibited and punishable. A number of other states have upheld the constitutionality of their "anti-pollution statutes" even though the statutes were phrased in unavoidably "general" language.

*People v. Plywood Mfrs. of California,* 137 C.A.2d 859, 291 P.2d 587; *Oriental Boulevard Co. v. Heller,* 297 N.Y.S.2d 431, *aff's* 265 N.E.2d 72; *Miami v. Coral Gables,* (Fla. App.) 233 So.2d 7; and *Portland v. Lloyd A. Fry Roofing Co.,* 3 Ore.App. 352, 472 P.2d 826.

Appellant next contends that those sections of the Act (Secs. 33(b), 42 and 44) granting discretionary power to the Board to impose penalties constitute a constitutionally invalid delegation of judicial powers to an administrative agency. This precise question has recently been considered, and opposite conclusions reached, by two other District Appellate Courts. In the Third District in *Ford v. Environmental Protection Agency* (1973), 9 Ill.App.3d 711, the court held that the authority of the Board to assess penalties constituted a quasi-judicial function which was subject to judicial review as to reasonableness and was, therefore, not violative of the constitution. In the Second District in *City of Waukegan v. Environmental Protection Agency,* 11 Ill.App.3d 189, the court found that the imposition of a monetary penalty or fine is strictly a judicial function which cannot be delegated to an administrative agency, and that, the *Ford* case notwithstanding, such judicial authority may not be granted under a "quasi-judicial" or "ministerial" guide.

It is no answer to say that the agency action in imposing a discretionary penalty is subject to judicial review, for the reason that as agencies are vested with increasing discretion, it appears that the judiciary's power of review decreases. It is a familiar principle of administrative law that the findings and conclusions of the administrative agency on question of fact shall be held to be prima facie true and correct, and the scope of judical review is limited to a determination if administrative findings and orders have support in the evidence. (*Harrison v. Civil Service Commission of the City of Chicago et al.,* (1953), 1 Ill.2d 137, 146, 147, 115 N.E.2d 521, 526.) This is not, however, the issue before us, and as was mentioned in *City of Waukegan, supra,* at 194 "it is pointed out merely to illustrate the limitations upon the scope of review of the actions of the Pollution Control Board". The point is that:

> "If we concede the power to an administrative agency to impose a discretionary fine * * *, we have invested all of the possible judicial power upon a ministerial body. The only function of a court not granted to that body is the judicial power to collect the fine imposed * * *" *City of Waukegan, supra,* at 106.

The real issue here involves the constitutionality of a broad delegation of judicial power in the Pollution Control Board. The Board derives this power from sections 33(b) and 42 of the Environmental Control Act (Ill. Rev. Stat. 1971, ch. 111½). Section 33(b) provides in part:

> "Such order may include a direction to cease and desist from viola-

tions of the Act or of the Board's rules and regulations and/or the imposition by the Board of money penalties in accord with Title XII of this Act."

Title XII of the Act, and specifically section 42 provides in part:

"Any person who violates any provision of this Act, or any regulation adopted by the Board, or who violates any determination or order of the Board pursuant to this Act, shall be liable to a penalty of not to exceed $10,000 for said violation and an additional penalty of not to exceed $1,000 for each day during which violation continues, * * *."

The problem this court sees with such a broad delegation of the power to impose a penalty to one of ten thousand dollars is the total lack of standards to guide the Pollution Control Board in imposing them. The state argues that to deny the propriety of these penalty provisions would be to completely frustrate the purpose of the Environmental Protection Act. The purpose of the Act as defined by section 2(b) is:

"* * * to establish a unified, statewide program supplemented by private remedies, to restore, protect and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them."

We fail to see how providing the Board with standards to guide it in the imposition of penalties, or providing it with the power to impose specific money penalties for specific violations would frustrate the purpose of the Act. Those persons polluting the environment would still bear the burden of the penalties. Furthermore, with some kinds of standards to guide it in imposing penalties, the Board will be less susceptible to pressure from overzealous environmentalists, resulting in unjust penalties being imposed. This type of argument was discussed by Professor Jaffe in a recent essay, The Illusion of the Ideal Administration, 86 Harvard Law Review 1183 (1973), wherein he criticized the popular belief that agencies function most appropriately under a broad, vague delegation.

While the question facing us is one of first impression before this court, the Illinois Supreme Court *has* indicated what type of delegation of power to impose penalties it considers constitutional. *In Department of Finance v. Cohen* (1938), 369 Ill. 510, 17 N.E.2d 327, the legislature had provided that the Department of Finance could compute a deficiency assessment under an act imposing a tax on persons engaged in the business of selling intangible personal property at retail. Appellant failed to pay the tax and asserted as his only defense that the act vested administrative officers with judicial powers. In holding that the statute

did not violate the Constitution by investing administrative officers with judicial powers, the court stated at 516:

> "The statute sets forth with great detail the matters which must go into the monthly return, and lays down a guide which, when followed, leaves nothing open for arbitrary discretion."

That holding was cited with approval in *Department of Finance v. Gandolfi* (1940), 375 Ill. 237, 30 N.E.2d 737. In *Gandolfi* the retailers occupation tax was assessed against the defendants, including a sum equal to the statutory penalty. The defendants argued that under the act judicial powers were granted to the Department, contrary to article 3 of the constitution. The Illinois Supreme Court, however, held that the power delegated was just ministerial, as requiring a mere calculation or computation from data upon which all minds must ordinarily reach the same result. *Gandolfi, supra,* at 240.

■■ It therefore appears that our Supreme Court will uphold the constitutionality of a delegation of the power to impose penalties where there are standards, or the penalty is merely a matter of a specified amount or simple calculation. By implication it is also reasonable to assume that the court would look with jaundiced eye upon attempts to vest such an agency with the power, unrestricted by specific statutory standards, to determine and impose penalties. (1 Cooper, State Administrative Law (1965), p. 87.) We feel that where the power to fix the penalty to be imposed for non-compliance with a statute is delegated to an administrative agency, strict standards, limiting administrative discretion within narrow limits, must be established by the legislature.

This argument has found support in the courts of other jurisdictions, and although the decisions of those courts are not binding upon us, their reasoning and analysis of the law is compelling. See *Broadhead v. Monaghan* (1960), 238 Miss. 239, 117 So.2d 881; *Tite v. State Tax Commission* (1936), 89 Utah 404, 57 P.2d 734. Cf. *Memorial Trusts, Inc. v. Beery* (1960), 144 Colo. 448, 356 P.2d 884; *Lewis Consolidated School Dist. v. Johnston* (1964), 256 Iowa 236, 127 N.W.2d 118.

■■ It is also important to note that the Pollution Control Board is the only agency in the public health area authorized to impose discretionary monetary penalties, and that it has more monetary discretion than Illinois courts have in imposing criminal fines under statutory provisions. In the opinion of this court no convincing argument has been made to show why the Pollution Control Board ought to have discretionary powers not possessed by other Illinois agencies in the public health fields, or even the Illinois courts. The failure of the Illinois General Assembly to provide the Pollution Control Board with any standards to guide it in imposing penalties for violations of the law constitutes an

unconstitutional delegation of legislative power. And once given this power to penalize absent any standards, the Board can impose discretionary fines which is a distinctly judicial act. Therefore, there is also an unconstitutional delegation of judicial power. This is a clear violation of the separation of powers doctrine, and should not be tolerated.

We align ourselves with the Second District on this question and adopt its reasoning. We therefore conclude that those sections of the Act purporting to delegate to the Board the power to levy fines or penalties are constitutionally invalid.

We do not wish to call attention to the arbitrariness of the penalty attempted to be imposed here. Appellant was found guilty only of failing to obtain an installation permit and not of operating without an operating permit. It had actually been operating for some time, and according to the Agency's own witnesses, it had been doing so in a clean, non-polluting manner. The only substantial testimony in the record is that the equipment installed was highly successful in controlling particulate emissions and that the operation was well within the permissible standards for asphalt plants. In spite of this fact, and the fact that appellant offered a reasonable explanation for its failure to obtain a permit prior to installation, the Board saw fit to impose a penalty of $5000 and order appellant to cease and desist further operation. Appellee attempts to justify this action by stating that the assessment of the penalty and the entry of the cease and desist order was the best possible way to correct the wrong and to deter the possibility of it happening again; that the purpose of requiring a permit prior to installation of a plant is to prevent the possibility of air pollution from a plant which might, when operated, cause or contribute to pollution; and that pollution control would thereby be assured prior to expenditure of large amounts of capital in the construction of such facilities. In conclusion, it is argued that, "Surely, this is a viable, practicable and a common sense approach."

We agree with the theory that it could be economically beneficial to a person to have his pollution control equipment approved prior to installation but, we are unable to fathom what possible application this theory has to the facts of the case before us. The Board's benevolent concern for the individual is certainly not reflected in the large amount of the fine imposed, nor is much concern shown for the community in depriving it of an industry employing approximately 50 people with a weekly payroll of $16,000. It would seem that to make its installation permit system effective and viable the Board believes that it has a right to levy an exhorbitant fine on one who fails to obtain a permit and to summarily put him out of business until he complies, and that such action is warranted not only as punishment but as a deterrent to others.

This does not appeal to us as the "common sense approach" claimed by the appellee. Each case must be considered on its own merits. Here there is no question that appellant had failed to obtain an installation permit, but under the facts such failure was not an intentional evasion of the requirement. The plant was operating with the knowledge of the Agency, but neither the Agency nor appellant realized that no installation permit had been issued. The Agency's own witnesses admitted that the plant was operating within permissive particulate emission standards. Perhaps the cease and desist order was entered because of the harm and inconvenience which the plant was alleged to be causing neighboring residents. If it were done for this reason then its action was clearly impermissible for as admitted by the Board the purpose of requiring an installation permit is merely to prevent the possibility of air pollution from a plant which might, when operated, cause such pollution. To close down an operating plant, not for causing pollution but for failure to obtain a preliminary installation permit amounts to a distorted interpretation of the Board's own rules and regulations. We mention these facts as a clear demonstration of the reason that imposition of monetary fines and the punishment of alleged offenses is better left to the judicial process rather than to the arbitrary discretion of an administration agency sitting as prosecutor, judge, and jury.

Finally, appellant argues that it was denied due process of law in that the Pollution Control Board rendered its opinion without the benefit of findings of fact made by a hearing officer. Testimony of the various witnesses was, in fact, taken before a hearing officer. However, no findings or recommendations were made and the Board rendered its opinion on the basis of their reading of the transcript alone. Petitioner argues that since no member of the Board heard the evidence or judged the demeanor and credibility of the witnesses is pivotal, and since no member of the Board had the benefit of findings by the hearing officer, it did not receive a fair hearing.

It appears that the Illinois Courts have not previously considered this issue. The general rule is contained in the following passage from American Jurisprudence:

> "In the absence of a specific statutory provision for a report by the hearing officer to the deciding authority it has been held that where the person who conducts the hearing does not participate in the decision, due process or a full or fair hearing requires that findings, conclusions, and impressions of conflicting testimony must be conveyed by either written or oral report where the weight and credibility to be given to various witnesses is the determining factor. However, it also has been held that while it is

a good practice to have an examiner prepare a report and submit it to the deciding officer and the parties and to permit exceptions and arguments addressed to the points thus presented, this particular type of procedure is not essential to the validity of a hearing where there is no violation of substantial rights." 2 Am.Jur.2d, *Administrative Law*, Sec. 430, P. 239.

As stated in an annotation in 18 A.L.R.2d 609, 629, although there is a conflict of authority, the better practice is for an administrative tribunal, which has not itself heard the evidence, to base its decision on findings of fact made by a hearing officer. The administrative body would not be bound by such findings, but they would be of unquestionable value to it where they took no part in the actual presentation of the evidence.

We agree with these statements and with the rationale of *Radaca v. The United States Smelting Co.*, 62 Ariz. 464, 158 P.2d 540, wherein it is stated:

"* * * It might be well to observe that a full and fair hearing to litigants under the due process clause of the constitution requires that the examiner or referee who hears the evidence, where there is a sharp conflict in testimony, must in some way participate in the decision or give it conclusions or impressions of such testimony by either written or oral report. The basis for this is that where weight and credibility is to be given to testimony of witnesses, the litigants are entitled to have the person who conducts the hearing and sees the witnesses to, at least, have his conclusions and impressions reported to the fact finding body. If a situation should arise where it could not be assumed that the observations and conclusions of the examiner had been communicated to the commission, and the evidence was in such conflict that the weight and credibility to be given the testimony of the various witnesses was the determining factor, the due process clause relating to hearings might have to be applied."

In the case before us there would have been no need for a finding of fact that appellant had failed to obtain an installation permit, for that was admitted. But when the hearing proceeded to hear evidence as to whether the plant was operating in violation of pollution standards and the Board used this evidence upon which to base a heavy fine and issue a cease and desist order the necessity for findings by the hearing officer becomes self-evident. The only testimony as to "pollution" was that of some neighbors complaining about noise, odor and inconvenience and this testimony was directly contradicted by others. The record also indicates that the petition did voluntarily bring to the attention of the authorities the fact that it was in violation of the Act; that there was a

plausible excuse for the failure to obtain the installation permit; that it was encouraged to locate in the area by the local city government; that it provided business and jobs for the surrounding area; that the extent of the air pollution was being controlled; and that it had done a great deal to remedy the complaints of the residents who lived around the plant.

Obviously, findings of facts on these matters would have been most helpful to the Board and it would be better practice for the Board to require in the future that a hearing officer submit findings of fact to it. However, because of our holdings on other issues here involved we do not believe it necessary and we specially do not rule, on whether the failure to submit findings in this instance constitutes a denial of due process.

■■■ In conclusion, we find that portion of the Board's order imposing a $5000 fine or penalty against appellant was constitutionally impermissible. We likewise find that appellant's plant had operated for some period of time and that in said operation its pollution control equipment was proven clearly "capable" of controlling pollution under the Board's own standards; that said operation was conducted with the knowledge of, and without objection by, the Agency which constituted, in effect, an acquiescence in said operation without an installation permit; and finally, that the Board in ordering a cessation of appellant's operations at that point in time exceeded its authority and violated the spirit and intent of its own rules and regulations.

At the time of oral argument we were informed that the plant had ceased operation and all equipment has been moved. Thus much of the controversy is now moot. Accordingly, the order of the Illinois Pollution Control Board assessing a fine on appellant is reversed.

Reversed in part.

EBERSPACHER, J., concurs.

Mr. PRESIDING JUSTICE GEORGE J. MORAN dissenting:

The Illinois Pollution Control Board found the appellant, Southern Illinois Asphalt Co., Inc., in violation of section 9(b) of the Environmental Protection Act and rule 3-2.110 of the Rules and Regulations governing the control of air pollution, to-wit: the appellant admittedly installed an asphalt plant without the requisite permit. The Pollution Control Board accordingly imposed two statutorily authorized sanctions: (1) Southern Illinois Asphalt Company was ordered to cease and desist operations at its McLeansboro Plant until the requisite permit was obtained, and (2) the company was ordered to pay a $5,000 fine. Ill. Rev. Stat. 1971, ch. 111½, pars. 1033(b) and 1042.

Aside from questions of constitutionality, this court is limited by law to review whether or not there has been an abuse of discretion by the Pollution Control Board in this case. A principle tenet of administrative law is that judicial review is limited to considering whether the decision of the administrative agency is arbitrary, capricious, unreasonable, or against the manifest weight of evidence. (*Skokie Federal Savings & Loan Assn. v. Savings & Loan Board*, 88 Ill.App.2d 373, 232 N.E.2d 167; *Fenyes v. State Emp. Retirement System*, 17 Ill.2d 106, 160 N.E.2d 810; *Group Securities Inc. v. Carpentier*, 19 Ill.App.2d 513, 154 N.E.2d 837; *Board of Education of Springfield School Dist. No. 186, Sangamon County v. Scott*, 105 Ill.App.2d 192, 244 N.E.2d 821; *Chicago Transit Authority v. Fair Employment Practices Commission*, 103 Ill.App.2d 329, 243 N.E.2d 638.

Although administrative agencies are organizationally considered within the executive branch of government, they characteristically exercise quasi-legislative power in the form of rulemaking and quasi-judicial power in the form of adjudicating specific cases in addition to traditional executive enforcement powers. Administrative agencies are usually created when policy requires governmental action that is too complex and involves too much factual investigation to be efficiently handled by a statute alone, by summary executive action or by purely judicial solutions. The Illinois legislature identified the policy of protecting the state's environment as one that needs administrative agency expertise to be effectively enforced by enacting the 1970 Environmental Protection Act which established the Environmental Protection Agency and the Pollution Control Board.

Protecting the environment is no small undertaking; it requires technical knowledge about air pollution, water pollution, land pollution and refuse disposal, noise and atomic radiation. Not only the welfare, but the very lives of the people of Illinois may depend on the specialized knowledge and expertise of the Environmental Protection Agency and the Pollution Control Board. The judges of this court are legal experts, unauthorized by law to substitute their judgment in place of the Pollution Control Board's expert judgment in this case, provided the Environmental Protection Act is constitutional and the Board did not abuse the discretion validly vested in it by the legislature.

Reviewing the record of this case, I am unable to find any abuse of discretion. The appellant admitted that it installed a portable asphalt plant in McLeansboro, Illinois, without first obtaining the permit which appellant knew was required by law.

Accordingly, the Board ordered the plant to cease operation and levied a fine. The Board is required to make its orders and determinations based

on the relevant statutory standards set forth in section 33 of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1033(c)):

"(1)  the character and degree of injury to or interference with the protection of the health, general welfare and physical property of the people;

(2)  the social and economic value of the pollution source;

(3)  the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved;

(4)  omitted because this guideline is irrelevant to this appeal; the Board found appellant guilty only of installing its plant without a permit."

I have read the hearing record carefully and have done some independent research into the operation of asphaltic concrete plants generally, and have been unable to find any bit of information that would support the conclusion that the penalties imposed by the Board were arbitrary, capricious or against the manifest weight of evidence.

Asphalt is a natural hydrocarbon or bitumen usually found around oil producing basins. Asphalt, however, can also be manufactured by crude petroleum refineries by a variety of methods. Approximately 90% of the asphalt used in this country is pyrogenous, i.e., manufactured asphalt. There are a few small patches of natural asphalt near Chicago, but there are no known significant deposits of asphalt-bearing rocks in Illinois. Although asphalt is often confused with tar or pitch, it is distinct in that tar and pitch are distillates from wood or coal.

An asphaltic concrete plant, such as the one installed in this case, prepares a heated mixture composed of rocks, sand, other minerals and asphalt, the asphalt acting as a mastic. The completed hot mix is dispatched in trucks to the pavement site and spread before the asphalt cools and sets. Because the asphalt must stay hot long enough to allow the mix to be spread, asphalt plants are often portable, i.e., the machinery can be transported to locations near the road building site. The asphalt plant installed by appellant in McLeansboro was a portable plant; indeed, the oral hearing before this court revealed that the plant is no longer there. In addition, because the asphalt must stay hot for a while, the asphaltic concrete industry seasonally operates, starting in early spring and stopping in late autumn. The hearing record suggests this was the operational pattern of the McLeansboro plant.

It is indisputable that asphaltic concrete plants pollute the air. Asphalt, like tar and other bitumens, has a resinous odor that fills the air. Its malodor is considered non-toxic but can cause nausea and insomnia in some people. Such asphalt fumes can be oxidized by potassium perman-

ganate solutions but rarely are, since it is an expensive procedure. More seriously, inhalation of asphalt fumes is linked, like cigarette smoking, to cancer of the lung. Aside from these ill effects, little else is known about these organic hydrocarbon contaminants.

The air pollutant that is consciously controlled at asphalt plants is dust. The dust results from the handling of the rocks, sand and other mineral material that are mixed with the asphalt. Dust is propelled into the air at the storage piles, the roads leading into the plant, the transfer points between the various operations, the dryer, the bucket elevators, the screens which grade the rocks, etc. Most asphalt plants control only the dust emissions from the dryer. Drying the rocks and sand to be mixed with the asphalt is an essential process in the manufacture of aphaltic concrete. The dryer reaches temperatures between 300° F. and 400 ° F. to remove the moisture from the material and to insure that this aggregate will not cool the asphalt when mixed. The dust that is blown off the drying rocks and sand flies up into a dust collector which is also known as a cyclone. The cyclone, while being a primary pollution control device which collects the heavy dust particles by centrifugal force and sends them back into the process, also furnishes the draft that draws the flame and hot gases through the dryer. The record in this case shows the appellant had a secondary pollution control device commonly known as a wet scrubber, in addition to the cyclone. The function of the wet scrubber is to wet down the dust that escapes the centrifugal force of the cyclone and to turn it into a sludge. Dust still escapes into the atmosphere but it is significantly less than if the wet scrubbers were not used.

Whether or not Southern Illinois Asphalt Company's McLeansboro Plant was unacceptably polluting the air is not an issue before this court and was never an issue in this case. What is important is that the asphalt plant installed was capable of polluting the atmosphere. Both common knowledge about the operations of asphalt plants generally as I have related above and actual testimony of the residents of McLeansboro contained in the hearing record established that the plant was fully able to coat the neighborhood with layers of dust.

Dust is a threat to people's health. The human body has several defenses to airborn dust particles, e.g., the nose hairs filter out particles larger than 10 microns. However, the tiny particles, the ones most likely to escape the asphalt plant's cyclone and wet scrubber are the ones most likely to elude the body's defenses and enter the lungs. There is evidence that these particles which reach the lungs may cause emphysema and lung cancer and at least can aggravate such diseases.

Using this technical background data as an informational foundation, it is necessary to consider the evidence produced at the hearing in rela-

tionship to the statutory standards the Pollution Control Board must use in making its determinations.

1. *The character and degree of injury to, or interference with the protection of health, general welfare and physical property of the people.*

Toward the end of the hearing in this case, several residents of Mc-Leansboro testified that the dust and asphalt odor was more than just psychologically irritating. Two witnesses testified that their respiratory problems had worsened. Residents also swore that they could not enjoy their yards as they had before the installation of the asphalt plant, e.g., cooking outdoors, gardening, etc., were severely curtailed. To make matters worse, the residents so affected by the plant were forced into a dilemma; there was uncontroverted testimony that the residential property value in the area had declined because of the asphalt plant. The neighbors had to endure the presence of the plant or sell·their real property at a loss.

In sum, the asphalt plant curtailed the enjoyment of the property around it and endangered the health of the neighbors.

2. *The social and economic value of the pollution source.*

To have asphaltic concrete pavements, it is necessary to have asphaltic concrete plants. No one associated with this hearing has expressed the desire to outlaw asphalt plants per se. The city fathers of McLeansboro apparently favored the installation of the plant because about 50 jobs would be available and the plant would have a weekly payroll of about $16,000 during the months of operation. In sum, the portable asphalt plant installed by appellant would have social and economic value to McLeansboro.

3. *The suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved.*

This standard acts as the balancing factor in this case. Neither the Pollution Control Board nor the residents who complained about the asphalt plant wanted to establish all locations in Illinois as unsuitable for asphalt plants. This is clear from the McLeansboro residents' testimony and the fact that the Southern Illinois Asphalt Company did receive an installation permit for its Mount Vernon asphalt plant. The cease and desist order was reasonable and the $5,000 fine was reasonable because this McLeansboro Plant was too close to residential property.

There is testimony in the record that the location chosen by appellant was not the only feasible location around McLeansboro. Had appellant applied for a permit to install its asphalt plant as required by law before actually installing and operating the plant, appellant would have known that the location chosen was unsuitable in the first place. Moving a port-

able asphalt plant is commonplace; moving this asphalt plant to a less residential, *i.e.*, less populated area, would not necessarily have meant the loss of 50 jobs and a $16,000 weekly payroll to McLeansboro. But, it would have meant cleaner, safer air to breathe for the people of Mc-Leansboro.

Dust pollution can be dispersed and diluted by natural forces and thereby cease to be pollution. Therefore, the distance between an asphalt plant and concentrations of population is the best pollution control device after the wet scrubber.

Taking into consideration that (1) the asphalt plant in this case was portable and therefore could be moved from place to place in violation of the Environmental Protection Act as well as in compliance with the Act, (2) there is a necessity to impress upon polluting industries that violation of the Environmental Protection Act is not an inconsequential infraction to be done with impunity, and (3) this particular asphalt plant because of its location interfered with the health, general welfare and physical property of the neighboring residents of McLeansboro, I conclude that the Pollution Control Board made a reasonable order in this case against the Southern Illinois Asphalt Company, including the imposition of a $5,000 fine.

On the issue of constitutional delegation of power, I think the Environmental Protection Act is constitutional in its entirety. I do not think that the Pollution Control Board's power to impose fines is an unconstitutional usurpation of judicial power. *Ford v. Environmental Protection Agency,* 9 Ill.App.3d 711, 292 N.E.2d 540; *City of Monmouth v. Environmental Protection Agency,* 10 Ill.App.3d 823, 295 N.E.2d 136; *Bath, Inc. v. Pollution Control Board,* 10 Ill.App.3d 507.

I find the reasoning in the above cases and the dissent in *City of Waukegan v. Environmental Protection Agency,* 11 Ill.App.3d 189, scholarly and correct. I only want to re-emphasize that the quasi-judicial powers were vested in the Pollution Control Board to enable it to successfully enforce the Environmental Protection Act. These powers, however, were not vested in the Board without limitation. Section 42 of the Act limits the amount of any fine imposed by the Board to $10,000 for a given violation. Section 41 of the Act incorporates the Administrative Review Act (Ill. Rev. Stat. 1971, ch. 110, pars. 264, *et seq.*) by reference, whereby the judicial branch has the power to review the reasonableness of administrative decision made by the Board, including the imposition of fines. It must be concluded that sections 41 and 42 of the Act provide adequate safeguards against any abuse of power in the levy of fines by the Pollution Control Board.

I would affirm in its entirety the Pollution Control Board's order.